LONE STAR GAS CO. *v.* TEXAS ET AL.

No. 313.   Argued March 28, 1938.—Decided May 16, 1938.

*Messrs. Charles L. Black* and *Marshall Newcomb,* with whom *Messrs. Roy C. Coffee, Ogden K. Shannon,* and *Ben H. Powell* were on the brief, for appellant.

*Messrs. Alfred M. Scott,* Assistant Attorney General of Texas, and *Edward H. Lange,* with whom *Mr. William McCraw,* Attorney General of Texas, was on the brief, for appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Railroad Commission of Texas brought this action, under Article 6059 of the Revised Civil Statutes of Texas, to enforce the Commission's order of September 13, 1933, prescribing the rate for domestic gas supplied by appellant, Lone Star Gas Company, to distributing companies in Texas. The rate was fixed at not to exceed 32 cents per thousand cubic feet instead of the existing charge of 40 cents. The District Court of Travis County, upon the verdict of a jury finding the prescribed rate to be unreasonable, denied relief and enjoined the Commission and the state officials from enforcing the Commission's order. The Court of Civil Appeals reversed the judgment and held the order to be valid. 86 S. W. (2d) 484. Rehearing was denied. 86 S. W. (2d) 506. The Supreme Court of the State refused writ of error and the case comes here on appeal.

Appellant, a Texas Corporation, operates about 4,000 miles of pipe lines located in Texas and Oklahoma through which it transports natural gas to the "city gates" of about 300 cities and towns in those States and sells and delivers the gas in wholesale quantities to distributing companies. The latter companies, with two exceptions, are affiliated with appellant, being subsidiaries of the same parent corporation. One of appellant's pipe lines extends from a gas field in Wheeler County, Texas, a part

of the Texas Panhandle field, crosses the southwestern corner of Oklahoma, is tapped for gas delivered at Hollis, Oklahoma, and returning into Texas runs generally in a southeasterly direction to various Texas points. At Okla-union, Texas, the line is tapped by a branch line which extends northward into Oklahoma and supplies certain cities in that State. At Petrolia, Texas, the line is joined by lines coming from Oklahoma.

The Commission dealt solely with the rate for the gas delivered in Texas. This consisted (1) of gas produced or purchased in Texas and transported and delivered entirely within that State, being upwards of 70 per cent. of the total; (2) that produced or purchased in Oklahoma and transported through appellant's lines into Texas which, on appellant's calculation, amounted at the average of the five-year period 1929-1933 to about 11 per cent. of the total; and (3) that produced or purchased in the Panhandle field in Wheeler County, Texas, amounting on the same computation to about 17 per cent. of the total.

The Commission gave a full hearing in which appellant participated. The Commission treated appellant's properties as an integrated system, and in that way "considered the Oklahoma properties and operations and the effect thereof on the revenues and expenditures within Texas," fixing the rate "for application within the jurisdiction of Texas." Appellant made no objection to that course. The Commission determined the rate base as of December 31, 1931, at $46,246,617.53, being $4,674,285.91 for production properties and $41,572,331.62 for transmission properties. The Commission considered appellant's revenues and expenses for a six-year period, 1927 to 1932, and made the rate on the basis of six per cent. as a minimum fair rate of return.

Appellant brought suit in the federal court, attacking the rate on constitutional grounds, but that court stayed its proceedings when the present action was brought by

the Commission. In this action appellant first submitted pleas to the jurisdiction of the state court, and pleas in abatement, which were overruled. In its answer appellant attacked the rate order upon the grounds (1) that transportation and sales to local distributing companies through high pressure lines "of gas produced in Wheeler County, Texas, and transported into and through Oklahoma and back into Texas without interruption" constituted interstate commerce, and that the order violated the commerce clause of the Federal Constitution; and that the same was true of the gas produced or purchased by appellant in Oklahoma and transported in high pressure lines to Texas for sale and delivery there; and (2) that the prescribed rate was confiscatory and repugnant to the due process clause of the Fourteenth Amendment.

The trial on the merits, before a jury, was begun on June 11, 1934, and was entirely *de novo*. The State introduced in evidence the Commission's order (to which appellant unsuccessfully objected as being void in its entirety because applicable to its interstate business), the stay order granted by the federal court, and a stipulation that the prescribed rate had not been put into effect. The record of evidence before the Commission was offered but was not received. On this formal proof the State rested. Appellant moved for a directed verdict which was denied and appellant then went forward with its evidence. The report and findings of the Commission upon which the order was based were introduced. In rebuttal of the Commission's findings, appellant submitted an appraisal of its properties as an integrated operating system as of January 1, 1933. That appraisal was voluminous, showing $73,983,405.57 as the cost of reproduction new. Evidence was offered as to the amount to be deducted for accrued depreciation and on that basis the fair value was claimed to be $69,738,021.16. The appraisal was later brought down to May 1, 1934, showing an increase in ma-

terial and construction costs between January 1, 1933, and May 1, 1934, of $1,579,381.72. The book costs of the properties were also introduced, ranging from $47,776,-749.63, on December 31, 1931, to $49,858,751.23 as of April 30, 1934. Appellant claimed that the books understated the actual costs. There was evidence with respect to the annual accruals to provide for depreciation, depletion and amortization. The operating expenses and revenues were shown for the years 1931, 1932 and 1933, and for the twelve months ending April 30, 1934. In this evidence there was no segregation of appellant's properties or operations as between Texas and Oklahoma or between intrastate and interstate business, appellant insisting that it was entitled to attack the Commission's order upon the same inclusive basis which the Commission had used.

The State insisted that if appellant wished to maintain as a defense that the order was invalid because it sought to regulate operations which were exempt from state control, appellant should make a segregation, first as between its admittedly intrastate operations and those claimed to be interstate, and second, as between Texas and Oklahoma properties and operations. After the voluminous evidence above mentioned had been taken, appellant, still contending that such an issue was not properly raised as the action under the Texas statute was in the nature of an appeal from the Commission's order which was indivisible, presented evidence based upon "a segregation of its 'integrated operating system' as between interstate and intrastate commerce." Appellant states that this segregation was based "upon the actual use of its properties in the two classes of commerce." The fair value of its intrastate property was thus claimed to be $38,350,882.32 and the net amount available at the Commission's rate for return on intrastate deliveries of gas as less than four per cent. In this segregation appellant's line used in trans-

porting gas from Wheeler County, Texas, in the Panhandle field, through Oklahoma and thence into Texas, was allocated to interstate operations.

In rebuttal, the State offered evidence based upon a different method of segregating appellant's properties and operations. This method proceeded upon the basis of geographical location, that is, there were allocated to Oklahoma and Texas respectively the properties physically located in each State and the revenues and expenses were divided on the same geographical basis. In that way the properties allocated to Texas were valued at $40,256,862.39, and the net revenue which would be available at the Commission's rate was estimated to be, for the last two years of the accounting period, nearly seven per cent. Appellant complains of this appraisal upon the ground that it excluded the production properties located in Texas which appellant claimed had an actual cost of $5,191,539.42 as of March 31, 1934, and that the State substituted therefor an arbitrary and inadequate annual allowance on the basis of the field price for the volume of gas produced.

When the evidence was closed, each party moved that a verdict be directed in its favor and both motions were denied. The court gave to the jury a series of instructions embracing definitions of the terms of "fair return," "fair value," "used and useful"—as applying to the property actually used by appellant in the production, transportation, sale and delivery of natural gas to its customers and also to the property acquired in good faith and held by appellant for use in the reasonably near future in order to enable it to furnish adequate and uninterrupted service—"operating expenses," "annual depreciation," "reproduction cost new," and "going value." The jury were instructed that the burden of proof was upon the defendant (appellant) "to show by clear and satisfactory evidence" that the rate fixed by the Commission's order was "un-

reasonable and unjust as to it," and the court explained that by that phrase was meant that the rate prescribed in the Commission's order "was so low as to have not provided for a fair return upon the fair value of defendant's property used and useful in supplying the service furnished by said defendant." With these instructions the court submitted to the jury a single special issue as follows:

"Do you find from the evidence in this case that, as applied to points in Texas, the order of the Railroad Commission of Texas, bearing date of September 13, 1933, providing for a rate of not exceeding 32 cents per thousand cubic feet of gas sold to the distributing companies at the gates of points served, is unreasonable and unjust as to the defendant, Lone Star Gas Company? Answer this question 'yes' or 'no' ".

The jury answered the question "yes." Judgment was entered accordingly enjoining the enforcement of the Commission's rate.

In view of the definition of "fair return" and "unreasonable and unjust" in the court's instructions, we are of the opinion that the issue for the jury to determine was in substance whether the rate was confiscatory. We so regarded a like submission in the case of *United Gas Public Service Co.* v. *Texas,* 303 U. S. 123. There the jury's verdict sustained the rate but that fact does not alter the nature of the issue submitted.

Under the state practice the issues of fact were determined in the trial court and on the appeal the Court of Civil Appeals had no authority to make findings of fact. "Where the evidence is without conflict, it may render judgment. But where there is any conflict in the evidence on a material issue, it has no authority to substitute its findings of fact for those of the trial court." *Post* v. *State,* 106 Tex. 500, 501; 171 S. W. 707; *United Gas Public Service Co.* v. *Texas, supra.*

The Court of Civil Appeals held that the burden was heavily upon the Company (appellant here) to show by clear and satisfactory evidence that the 32-cent rate would not afford a reasonable rate of return on the property used in the Texas public service, that the Company did not meet "this burden and quantum of proof," and that the trial court erred in overruling the State's motions for an instructed verdict. The court viewed the appeal as presenting two main divisions, (1) certain constitutional objections to the rate order, and (2) the legal sufficiency of the evidence to show that the order was confiscatory or unreasonable and unjust. Under the first division, the court considered that there were three constitutional objections, (a) interference with interstate commerce, (b) interference with the right to contract, and (c) confiscation of property. The court sustained the jurisdiction of the Commission to deal with the operations of appellant and its corporate affiliates in Texas as "a single and integrated business enterprise." On the first two issues above-mentioned the court ruled in favor of the State, and on the confiscation issue the court considered that the question whether the prescribed rate would yield a fair return was one of fact and passed to the consideration of the legal sufficiency of the evidence.

Holding that the rate fixed by the Commission was presumed to be valid, and referring to the authorities as to the scope of judicial review, the court set forth the five primary factors essential to the correct determination of the issue, viz., the present fair value of the property of the Company used in the public service, the reasonable annual allowance for depreciation, the reasonably necessary operating expenses, the reasonable operating revenues, and the reasonable rate of return.

But in dealing with the evidence upon these questions, the court applied a different criterion from that adopted by the Commission. The court held that it was necessary

to segregate the property used in Texas, as well as that used conjointly in Texas and Oklahoma. The court spoke definitely upon this point, saying—

"Since appellee [appellant here] was engaged in the integrated business of producing, purchasing, transporting and selling natural gas to the distributing companies at the city gates of some 300 cities and towns in Texas and Oklahoma, it became necessary to allocate or segregate the property used in Texas as well as that used conjointly in both states, in order to determine the fair value of the property used in the Texas public service, the annual depreciation thereof and the Texas operating expenses and revenue."

The court then set forth the different methods of segregation which the parties had adopted. The court said that the State's method allocated "to Texas operations, or to intrastate commerce the value of all property located within the physical boundary of Texas." The "short section" of pipe line "from Texas Panhandle field across the corner of Oklahoma and back into Texas was also allocated to Texas operations." "Gas sales adjustment" was made by which "Texas or intrastate operations" were charged with the net amount of Oklahoma produced gas for the six-year period 1929 to 1934. The court observed that "no charge against Oklahoma or interstate operations was made for the use of the transmission lines and for equipment within Texas; the effect of which was to give free transportation in Texas of all Oklahoma produced gas." Texas and Oklahoma expenses and revenues "were allocated in general accord with the segregation of the physical properties." The court stated that under that method the fair value "of the property undepreciated used in Texas public service was $40,256,862.39" according to the calculations of the State's experts; and that after deducting operating expenses and annual depreciation "there remained for the last two years of the accounting period,

being the two lowest revenue years," Texas net revenue "which would yield a return of 6.74% and 6.76% respectively."

The court then referred to the method of segregation used by the Company by which all the gas produced or purchased in the Texas Panhandle field and transported into Texas, and all Oklahoma produced gas, were allocated to interstate commerce; that the allocation was made by a determination of the specific gravity of the Oklahoma and Texas Panhandle gas on the one hand and the West Texas gas with which it was commingled in pipe lines on the other; that the Company had allocated operating expenses and revenue between the two States upon substantially the same basis; and that in this manner the fair value of the property used in the Texas public service on the basis of reproduction cost new, less depreciation, was said to be $38,350,882.32. The court held that gas from the Texas Panhandle field did not move in interstate commerce and hence that the testimony of the Company's experts was based upon an erroneous assumption and "proved nothing material to this case"; that the Company had offered no other proof upon a correct segregation or allocation of the property, and that the trial court had erred in refusing the State's motion for an instructed verdict and for a judgment declaring the rate order "to be valid in every respect."

The court's specific ruling upon this point is shown by the following statement of its conclusion:

"The burden was upon appellee to show by clear and satisfactory evidence a proper segregation of interstate and intrastate properties and business, and to show the value of the property employed in intrastate business or commerce and the compensation it would receive under the rate complained of upon such valuation. Having failed to make a proper segregation of interstate and intrastate properties, appellee did not adduce the quantum

and character of proof necessary to establish the invalidity of the rate as being confiscatory, or unreasonable and unjust."

The court adverted to the effect of the difference in theory in the two methods of segregation "with respect to the fair value of the property used in Texas public service, the annual depreciation thereof, and particularly as to the operating expenses and revenues." The court characterized the annual depreciation allowances as speculative and plainly excessive. The court said that with respect to operating expenses, except as to a few controverted items, and with respect to revenues, there was no substantial difference in the testimony "as to totals of both Texas and Oklahoma for the years of the accounting period" but that the same controversy arose "as to a proper segregation of such expenses and revenues to each State"; and since, as already pointed out, the Company had "failed to make proper segregation of the expenses and revenues, it failed to prove its case."

The court then criticised certain items of operating expenses as contrary to the actual experiences of the Company or so large as to be excessive upon their face, referring in particular to the items of "federal taxes," management fees charged by the holding corporation, new business expenses, canceled and surrendered leases, regulatory commission and general expenses, and going value. The court also took the view that no reason existed why a six per cent. rate of return should be declared confiscatory.

That the judgment of reversal was rested upon the proposition that there was a failure of proof on the issue of confiscation by reason of the fact that the Company had failed to make a proper segregation of its interstate and intrastate properties and operations is fully confirmed by the further opinion of the court in denying the Company's motion for a rehearing, when the court said:

"We held that as a matter of law appellee failed to establish by clear and satisfactory evidence the ultimate

fact issue, to wit: Whether the rate fixed by the Commission was so low as not to afford a reasonable return on the fair value of the property used in the Texas public service. Appellee was afforded a seven months hearing before the Commission and a three months trial on appeal to the court. It made no segregation as between its Texas and Oklahoma properties and operations; and did not prove the fair value of the property used in the Texas public service. The question of the value of such property determines the reasonableness of the rate and probably, in the ultimate analysis, adequacy of service and principles of financing."

The Court added that the valuation of such public service property was in the main a matter of estimate or opinion; that a scientific standard of absolute value was unattainable; and that because of this uncertainty, except where the evidence clearly shows gross over or under valuation, or "mistake, inequality or fraud" in the appraisal, the finding of value by an administrative commission is generally given finality and that this especially was the rule in the absence of an actual test under the new rate.

*First.* We agree with the state court that the Commission's order did not violate the constitutional rights of appellant under the commerce clause.

The Commission did not attempt to regulate the interstate transportation of gas. Compare *Hanley* v. *Kansas City Southern Ry. Co.,* 187 U. S. 617; *Western Union Telegraph Co.* v. *Speight,* 254 U. S. 17; *Missouri Pacific R. Co.* v. *Stroud,* 267 U. S. 404. Nor, in view of the circumstances in the instant case, can it be said that the Commission was undertaking to regulate sales and deliveries of gas in interstate commerce. Compare *Missouri* v. *Kansas Natural Gas Co.,* 265 U. S. 298; *Peoples Natural Gas Co.* v. *Public Service Commission,* 270 U. S. 550; *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465; *State Tax Commission* v. *Interstate Natural*

*Gas Co.*, 284 U. S. 41; *State Corporation Commission* v. *Wichita Gas Co.*, 290 U. S. 561. The distributing companies in Texas, with the exception of those at Waxahachie and Gainesville (the amount of deliveries there being negligible in comparison with appellant's total gas business), are appellant's affiliates. The Lone Star Gas Corporation, organized in Delaware, holds more than 99 per cent. of the capital stock of appellant and owns or controls a like proportion of the capital stock of the distributing companies. Thus, the latter companies and appellant are but arms of the same organization doing an intrastate business in Texas and the Commission was entitled to ascertain and determine what was a reasonable charge for the gas supplied through this organization to consumers within the State. *Western Distributing Co.* v. *Public Service Commission*, 285 U. S. 119, 124; *Dayton Power & Light Co.* v. *Public Utilities Commission*, 292 U. S. 290, 295; *American Telephone & Telegraph Co.* v. *United States*, 299 U. S. 232, 239. It appears that there were pending before the Commission proceedings involving the reasonableness of the rates charged by the distributing companies to consumers in many communities in Texas, and in relation to those proceedings the Commission found it necessary to determine what would be a reasonable charge for the gas delivered by appellant to the distributing companies at the "city gates." It was obviously to the convenience of both the Commission and appellant that this essential factor should be ascertained in a single proceeding and the Commission's investigation, which led to the order now in question, was undertaken to that end. We think that appellant's sales and deliveries of gas in Texas to the distributing companies must be regarded as an essential part of the intrastate business in the conduct of which the appellant and the distributing companies were virtual departments of the same enterprise.

238

Appellant's pipe line from the Texas Panhandle field in Wheeler County led from production properties in Texas to distributing points in the same State. The fact that the line cut across a corner of Oklahoma did not make it any the less a part of the system serving Texas gas to communities in Texas. In ascertaining what would be a reasonable rate of charge for this Texas gas supplied to Texas consumers, it was not only fair but manifestly necessary to take into account the value of the production properties in Texas from which the gas was taken and also the value of the transmission line by which the gas was brought to the city gates of the Texas communities. It is futile to contend that in making its calculations on that basis, the Commission was regulating interstate transportation or imposing any burden upon interstate commerce. The *Hanley, Speight* and *Stroud* cases, *supra*, upon which appellant relies, are not in point. In seeking to assure a just determination of a reasonable charge for the sales and deliveries in the intrastate business in Texas, the State was protecting its local interests and its action was not in conflict with any federal regulation. *Minnesota Rate Cases*, 230 U. S. 352, 402.

We think that the value of the pipe line from the Texas Panhandle field was properly included by the Commission in the rate base.

With respect to the gas produced or purchased by appellant in Oklahoma and transported by its pipe lines to Texas, the state court observed that the Oklahoma gas was run through extraction plants in Texas, leaving the residue gas changed in its composition and with its heating value lowered; that large amounts of the Oklahoma gas were run through and stored in wells in Texas; that, passing into appellant's pipe line system, that gas was commingled with Texas gas and divided and redivided until it was impossible to trace or identify it by

volume at any city gate of delivery; that at various points before delivery its pressure was reduced and the gas allowed to expand; and that the amount of Oklahoma gas as a whole was negligible in comparison with the amount of the Texas gas with which it was mixed. Appellant refers to the testimony of its witness that the composition of the gas, after certain heavy hydro-carbons were removed at the gasoline plants, remained practically the same, that its forward movement was not stopped, and that not all of the gas coming from Oklahoma was stored in Texas. Appellant also contends that the state court erred in saying that only about four per cent. of its total gas came from Oklahoma, insisting that the correct figure was about eleven per cent. The discrepancy is apparently explained by the fact that the state court's figure was taken from the results of the year 1933 while that of the appellant is for the five years of its accounting period. It would seem, however, that the amount of the gas transported from Oklahoma into Texas was at a diminishing rate. Aside from that, we think that the proved manner in which the gas from Oklahoma was treated and handled in Texas made it an integral part of the gas supplied to the Texas communities in appellant's intrastate business and that the Commission was entitled so to consider it in fixing its rate.

It is in this light that the inclusion by the Commission in its calculations of appellant's producing properties in Oklahoma and its transmission lines to Texas must be considered. The purpose of these calculations was to give proper credit to appellant for its investment and operating expenses in determining a rate for the gas sold and delivered in Texas. The Commission did not attempt to fix a rate for gas supplied to Oklahoma communities and did not impinge upon the jurisdiction of Oklahoma. There is no ground for concluding that the Commission's

method of calculation either created any burden upon interstate commerce or operated to appellant's injury in relation to its intrastate business in Texas. Not only is the contrary a fair inference from the fact that appellant raised no objection to this method before the Commission, but the State points to the evidence which appears to show that the Oklahoma operations were more expensive than those in Texas and that the Commission's calculations actually produced a result more favorable to appellant than one which would have followed any segregation. Appellant does not successfully meet this contention.

*Second.* Concluding that appellant had no tenable objection to the method adopted by the Commission in treating appellant's property as an integrated operating system, and making its findings as to value, expenses, and revenues accordingly, for the purpose of determining the fair rate for the gas sold and delivered in Texas, we come to the issue of confiscation.

The Commission's order was presumptively valid, as the state court held, but it was open to attack in this action under the state statute. Appellant was entitled to present evidence to rebut the Commission's findings of value, operating expenses, revenues and return, upon which the order rested. Appellant presented much testimony and elaborate statistical data for that purpose, treating its property and business as the Commission had treated them. Appellant claimed that this evidence showed a far higher value for its properties than the Commission had allowed and that the rate imposed was confiscatory. The trial court submitted that evidence to the jury, under a proper instruction as to the burden of proof resting upon appellant, and the jury found in appellant's favor.

The Court of Civil Appeals reversed the judgment upon a distinct ground. That was that appellant had not sus-

tained its burden of proof because it had failed to make "a proper segregation of interstate and intrastate properties and business." Thus, the necessity for that segregation was made the criterion. That is clearly shown both from the court's main opinion and its opinion upon rehearing from which we have quoted. "Having failed to make a proper segregation of interstate and intrastate properties," said the court, "appellee [appellant here] did not adduce the quantum and character of proof necessary to establish the invalidity of the rate as being confiscatory, or unreasonable and unjust."

We think that this ruling as to the necessity of segregation, and that the sufficiency of appellant's evidence should be determined by that criterion, was erroneous. This was not a case where the segregation of properties and business was essential in order to confine the exercise of state power to its own proper province. Compare *Smith* v. *Illinois Bell Telephone Co.*, 282 U. S. 133, 148, 149. Here, as we have seen, the Commission in its method of dealing with the property and business of appellant as an integrated operating system did not transcend the limits of the state's jurisdiction or apply an improper criterion in its determinations. But if in the circumstances shown the Commission was entitled to make its findings with respect to appellant's property and business upon the basis it adopted in order to fix a fair rate for the sales and deliveries in Texas, appellant was entitled to assail those findings upon the same basis. If the findings of the Commission as to value and other basic elements were to be taken as presumptively correct and appellant could not succeed save by overcoming those determinations by clear and convincing proof, appellant could not be denied the right to introduce evidence as to its property and business as an integrated system and to have the sufficiency of its evidence ascertained by the criterion which the Commission had prop-

erly used in the same manner in reaching its conclusion as to the 'Texas rate. Neither the fact that appellant, because of the insistence of the State that the property and business should be segregated, finally introduced evidence for that purpose, nor the inadequacy of its method of segregation, could detract from the force of the proof it had already submitted in direct rebuttal of the Commission's findings. The effort at segregation came after voluminous testimony had been taken which fully presented appellant's case with respect to the value of its property and the result of its operations as an integrated system and the bearing of this evidence upon the contested rate. This proof could not be ignored because of a futile attempt, in response to the State's pressure, to find an alternative ground to support the attack upon the Commission's order. The first and primary ground remained and the determination of the court of first instance as the trier of the facts that the Commission's rate was confiscatory could not properly be set aside by the application of an untenable standard of proof and in disregard of the evidence which had been appropriately addressed to the Commission's findings and had been properly submitted to the jury.

The judgment of the Court of Civil Appeals is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

Mr. Justice Black dissents.

Mr. Justice Cardozo took no part in the consideration and decision of this case.