

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

GERALD C. MANN
~~WILL WILSON~~
~~ATTORNEY GENERAL~~

Honorable Bert Ford, Administrator
Texas Liquor Control Board
Austin, Texas

Dear Sir:

Opinion No. O-4750

Re: The authority of the Texas
Liquor Control Board to
refuse a package store permit
to a subsidiary corporation
because of a violation by its
parent corporation of the
provisions of Article 666-17(2),
Vernon's Penal Code of Texas.

Your request for opinion, dated July 27, 1942, has been received
and considered by this department. We quote from your letter as
follows:

"A group of drug stores commonly referred to as
'Walgreen' Drug Stores operating in Texas are five
separate domestic corporations which hold an
aggregate of twenty-three package store permits to
sell liquor at retail. They are as follows:

| "Name of Company | Number of Permits Held |
|---|---|
| "1. Walgreen Incorporated | 4 |
| "2. The Walgreen Company of Texas | 5 |
| "3. The Walgreen Texas Company | 5 |
| "4. Walgreen Drugs Incorporated | 5 |
| "5. Marvin Drug Company | 4 |

"For purposes of determining whether or not the Texas
Liquor Control Act should so operate and should be so
construed as to affect or limit the number of permits
held by these combined companies, an inquiry has been
made into the ownership, management, and control of the
respective enterprises, and the facts in respect thereto
are probably more definitely reflected in the attached
transcript of interrogatories propounded to and answered
by Mr. P. J. Redford of Chicago, Assistant Secretary of
the Walgreen Company of Chicago, Illinois. From the
transcript of testimony reflected by this inquiry, it
may be observed that the five domestic corporations are

actually subsidiaries of the Walgreen Company of
Chicago, a foreign corporation, with earnings or
dividends accruing to each respectively for the
benefit of the Walgreen Company of Chicago, and with
the general management of the subsidiary companies
controlled by officers of the Walgreen Company of
Chicago.

"In determining whether or not the respective corpora-
tions may each obtain and use five package store
permits, it appears necessary to first determine the
legislative intent with reference to the limitations
imposed upon any person as to the number of permits in
which such person may have ownership or an interest.

"After reviewing the facts in connection with this matter,
will you kindly advise whether or not in your opinion
each of the respective corporations is eligible for a full
number of five permits, or whether the limitation of five
package store permits would be applicable to the parent
company, the beneficial holder of all of the stock of the
various subsidiary companies. All existing permits will
expire on August 31, 1942, and it is desired to resolve
this question in advance of that date."

In the preparation of this opinion we have also considered the
transcript of interrogatories propounded to and answered by Mr.
P. J. Redford of Chicago, Assistant Secretary of the Walgreen
Company of Chicago, Illinois, together with the exhibits
attached thereto; however, in view of the conclusion herein
expressed, this transcript and accompanying exhibits will not
be summarized herein.

Subsection (2) of Section 17, Article 666, Vernon's Penal Code,
provides:
    "It shall be unlawful for any person to hold or have an
    interest in more than five (5) package stores or the
    business thereof. It shall further be unlawful for any
    person to hold or have an interest in more than five (5)
    package store permits."

By Section 3-a of the same Article, "person" is defined as:

    ". . . any natural person or association of natural
    persons, trustee, receiver, partnership, corporation,
    organization, or the manager, agent, servant, or
    employee of any of them."

On the assumption that the Walgreen Company of Illinois
(hereinafter called the Illinois Company) is the beneficial

owner of all the stock in the five Texas companies, then, in so far as these provisions are concerned, unless the Illinois Company holds or has an "interest" in the package stores organized under the names of the Texas companies or in the business thereof or in the package store permits obtained by such stores, each of the five Texas companies is eligible to receive five package store permits.

We construe the word "interest" as used in the above Section according to its legal rather than its popular usage, and interpret it as being synonymous with legal title or equitable title or both. This interpretation is in accord with that previously placed upon the word by the courts of this and other jurisdictions. In Automobile Mortgage Company v. Ayub, 266 S.W. 134 (Com. App. 1924), the Commissioner of Appeals held that a sale of corporate shares was not a transfer of an interest in intoxicating liquor owned by the corporation, because such sale conveyed neither legal nor equitable title to the liquor. A similar interpretation has been placed upon the word by the Supreme Court of the United States in applying the "commodities clause" of the Hepburn Act. This clause prohibits railroad companies from transporting any commodities in which such companies "may have any interest, direct or indirect." U.S.C., Title 49, § 1 (8). In United States v. Delaware & Hudson Co., 213 U.S. 366 (1908), at p. 413, the court held that the mere fact that a railroad owns part or all of the stock in a coal company does not mean that the railroad possesses "an interest direct or indirect" in the property or products of such company, since the word "interest" is synonymous with legal or equitable title or both. This construction has often been reiterated by the court. United States v. Lehigh Valley Railroad Company, 220 U.S. 257 (1910); United States v. Elgin, J. & E. Railroad, 298 U.S. 492 (1935).

With the word "interest" thus construed, it is patent that a stockholder in a corporation does not, by the mere fact of his stock ownership, have or hold an interest in stores operated by the corporation, in the businesses thereof, or in any permits which these stores might possess. We quote from 10 Texas Jurisprudence 781, sec. 153:

"In harmony with the concept that a corporation is a legal entity distinct from its members, the ownership of the corporate assets is held to be vested in the corporation, not in the stockholders."

In Automobile Mortgage Company v. Ayub, supra, the court quoted with approval the following statement:

"A share of capital stock is property of a peculiar kind.

> Accurately speaking, it does not consist in an interest either legal or equitable, in the property of the company." Herbert v. Simpson, 220 Mass. 480, 108 N.E. 65

Although a stockholder does possess substantial rights to the surplus of a corporation, once dividends are properly declared, and although he is entitled to a pro rata share of the corporate assets upon dissolution, these rights are of an inchoate nature so long as the organization is a going concern and so long as no specific property has been appropriated for the payment of dividends. McAllister v. Eclipse Oil Company, 98 S.W. (2d) 171, 176 (Sup. Ct.); 10 Tex. Jur. 780-781, sec. 152.

Moreover, these principles are equally applicable in cases where all of the stock of one corporation or of several corporations is owned by a parent organization; even in these situations, the parent corporation possesses no interest in the property or the business of the subsidiary corporations. Moroney v. Moroney, 286 S.W. 167, 169 (Com. App. 1926). Consequently, in the situation under discussion, the fact that the Illinois Company is the beneficial owner of all the stock of the five Texas companies does not, ipso facto, make the Illinois Company the possessor of an interest in the package stores or in the businesses thereof, or in the package store permits of the Texas companies; however, while concentration of stock ownership in the hands of the Illinois Company is not in itself determinative of the question under consideration, it may well be an important evidentiary factor in connection with matters hereafter discussed.

In an opinion approved by Attorney General McCraw (Opinion No. 3004, September 1, 1937), this department ruled that ownership by one person of stock in three of the five Texas Walgreen companies now under consideration did not constitute a violation of Article 666-17(2) even though the three companies might, in the aggregate, possess more than five package store permits. We adhere to the opinion therein expressed, but call especial attention to the fact that this opinion was expressly predicated upon the statement of facts submitted to this department and that such facts touched solely upon the question of whether stock ownership is coupled with other facts, hereinafter to be mentioned, concerning the motives and interrelations of the persons and organizations involved.

But, although stock ownership alone does not give the Illinois Company an interest in the Texas companies, the company may well be deemed to possess such an interest through the application of other well known and widely accepted principles of corporation law. Along with the courts of virtually every other jurisdiction, the Texas courts have long recognized that there are certain well

defined instances in which courts will disregard the fiction of
corporate entity and will find that parent and subsidiary
companies are one for the purpose of charging the parent with the
acts of the subsidiary. As has been said, the concept of
corporate entity is "but a legal fiction adopted for convenience;
it is not a sacrosanct principle granting exemption from liabi-
lity in circumstances wherein the fiction of corporate entity is
opposed to the facts." 10 Tex.Jur. 640-641, sec. 45. Where the
fiction is so disregarded, the parent possesses an "interest" in
the subsidiary since the fictional dichotomy between the two
organizations disappears and they are treated as a unity.

The application of this principle is well illustrated by the
Supreme Court cases, cited supra, construing the commodities clause.
The government in the first suit alleged only that the Lehigh
Valley Railroad Company owned stock in a coal company whose goods
it was carrying. On demurrer, it was held that no violation of
the clause was thereby shown since stock ownership alone was not
tantamount to an "interest, direct or indirect" in the coal
company. After this blow, the government presented an amended
petition in which it alleged additional facts of the nature
hereinafter to be discussed and requested that the two cor-
porations be treated as a unity. The court disregarded the
corporate concept, and, looking at the substance and reality of the
relations between the parent and subsidiary, held that the former
was directly interested in the coal produced by the latter.

In the case of Continental Supply Co. v. Forrest E. Gilmore Co.,
55 S.W. (2d) 622 (Civ. App. 1932), writ dismissed, at p. 628, the
Amarillo court thus classified the situations in which the fiction
of corporate entity will be disregarded:

> "Where the fiction (1) is used as a means of perpetrating
> fraud; (2) where a corporation is organized and operated
> as a mere tool or business conduit of another corporation;
> (3) where the corporate fiction is resorted to as a means
> of evading an existing legal obligation; (4) where the
> corporate fiction is employed to achieve or perpetrate
> monopoly; (5) where the corporate fiction is used to
> circumvent a statute; and (6) where the corporate fiction
> is relied upon as a protection of crime or to justify
> wrong."

This classification was adopted in Pacific American Gas Company
of Texas v. Miller, 76 S.W. (2d) 833, 851, writ refused, and was
cited with approval by the Commission of Appeals in First
National Bank in Canyon v. Gamble, 132 S.W. (2) 100 (1939), at
p. 103. Items (1), (3), (4) and (6) in the above classification
are inapplicable to the instant situation and will not be con-
sidered further. Since the remaining items may well be relevant

to the solution of the matter at hand, they will be discussed individually.

(a) Where a corporation is organized and operated as a mere tool or business conduit of another corporation: We quote from 10 Tex.Jur. 1019-1020, sec. 354:

> "Formerly, it was held by the Texas courts that: 'Where one corporation makes use of another as its instrument through which to perform its business, the principal corporation is really represented by the agents of the subcorporation, and its liability is just the same as if the principal corporation had done the business in its own name.' The authorities so holding have, however, been in effect overruled so far as they assert a rigid conclusion of law in the circumstances stated. But although the doctrine that the two corporations are separate legal entities forbids the legal conclusion that one corporation is the agent or partner of another without facts to warrant that conclusion, the one corporation may be liable for the transactions and acts of the other <u>where one is in fact the agent of the other or where a partnership in fact exists between the two organizations.</u> Moreover, the fiction of separate entities is not maintained where a subsidiary is not conducted bona fide as a separate organization. . . ."

In Wormser, "Piercing the Veil of Corporate Entity," 12 Columbia Law Review 496 (1912), at pp. 504-505, it is said:

> "It cannot be too strongly emphasized that mere identity of stockholders per se does not operate to destroy the distinct corporate existence of two corporations. So much is clear. It must further appear by clear and convincing evidence that the corporation created is only an adjunct of the business of its creator - a mere agency or instrumentality, through which it acts - a mere business department, or bureau, so to speak. Once, however, these facts appear, a court . . . should look through the thin guise of corporate entity to the actual substance of things and should not hesitate to cast aside the entity concept in order to achieve justice."

In Humble Oil & Refining Company v. Railroad Commission, 128 S.W. (2d) 9 (1939), at p. 11-12, the Supreme Court stated:

> "In the case just cited (State v. Lone Star Gas Co., 86 S.W. (2d) 484, 491, writ refused) the rule of law here involved is thus stated: 'The cases are legion which

deal with the relationship of two or more corporations
from the standpoint of ownership of the capital stock
in one by another, and from the standpoint of associa-
tion together for the purpose of carrying on a single
or common business enterprise.  The rule is well settled
that courts will look through the forms to the realities
of the relationship between two or more corporations in
order to determine whether each is a separate entity or
corporation: or whether their commingled affairs are such
as to constitute them one integrated and single business
enterprise; or whether, through intercorporate set-up,
affiliation, or stock ownership, the purpose is to con-
trol the subsidiary corporation or corporations so that
they are used as the mere instrumentalities or agents of
the owning corporation or corporations.  In discussing
the rule, it has been held that while "ownership, alone,
of capital stock in one corporation by another, does not
create an identity of corporate interest . . . or create
the relation of principal and agent or representative
between the two"; still it has been repeatedly held that
such rule is not applicable "where stock ownership has
been resorted to, not for the purpose of participating in
the affairs of a corporation in the normal and usual
manner, but for the purpose . . . of controlling a
subsidiary company so that it may be used as a mere
agency or instrumentality of the owning company or
companies."  Chicago, M. & St. P. Ry. v. Minneapolis
Civic & Commerce Ass'n, 247 U.S. 490, 38 S. Ct. 553, 557,
62 L. Ed. 1229; United States v. Lehigh Valley R. Co.,
220 U.S. 257, 31 S. Ct. 387, 55 L. Ed. 458; United States
v. Reading Co., 253 U.S. 26, 40 S. Ct. 425, 64 L. Ed.
760; United States v. Delaware, L. & W. R. Co., 238 U.S.
516, 34 S. Ct. 873, 59 L. Ed. 1438.  Also, in discussing
the rule, the fact that the same persons are directors
and managers of two corporations has been given con-
sideration (McCaskill Co. v. United States, 216 U.S.
504, 30 S. Ct. 386, 391, 54 L. Ed. 590), and "a growing
tendency is therefore exhibited in the courts to look
beyond the corporate form to the purpose of it, and to
the officers who are identified with that purpose."
See, also, Gallatin Natural Gas Co. v. Public Service
Co., 79 Mont. 269, 256 P. 373.  Where one corporation
owns or  dominates another, it has been often held that
"the independent entity of the two companies is so far
disregarded that each is considered as but a part of the
indivisible whole."  Kimberly Coal Co. v. Douglas (6 Cir.),
(C.C.A.( 45 F. 2d 25, 27; In re Kentucky Wagon Mfg. Co.,
D. C., 3 F. Supp. 958; Law v. McLaughlin, D.C., 2F Supp.
601.  And "the rule which appears to be established by
these cases is that, where the corporate organization and

affairs of one railroad company are controlled and dominated by another railroad company through ownership of stock or lease, the roads must be regarded as identical for the purpose of rate making." Pontiac, O. & N. Ry. Co. v. Michigan R.R. Com., 203 Mich. 258, 168 N. W. 927, 929.

"'A somewhat analogous question was decided by this court in A.T. & S.F. Ry. Co. v. R.R. Com., 77 S.W. 2d 773, 775 (writ refused), wherein it was held that subsidiary corporations, owned, controlled, and operated by railroads to carry on pick-up and delivery service, did not possess separate legal individuality from the parent corporation, as regards the jurisdiction of the Railroad Commission; and wherein it was held as follows; "To permit railroads to perform such steps in the process of transportation through other separate legal entities created and owned by them would enable them to defeat the jurisdiction of the commission over such transportation. And in such case where the stock of such separate corporation is owned by the railroad company, and its sole function is merely to help conduct the business of the parent corporation under whose complete control it operates, and in the instant case largely, if not wholly, through the same employees, the subsidiary corporation will be treated as if it were a mere department of the railroad itself."'

"The judgment in the Lone Star Gas Company case, supra, was reversed by the Supreme Court of the United States (304 U.S. 224, 58 S. Ct. 883, 82 L. Ed. 1304), but the rule of law above announced was not questioned. We here and now approve and adopt as the holding of this Court the above-quoted holding of the Court of Civil Appeals." (Emphasis ours)

The difficult problem is the ascertainment of what facts of ownership, control, and management in a common enterprise are necessary to justify the characterization of a subsidiary as an "adjunct," "agency," instrumentality," or "creature" of the parent. In Ballantine on Private Corporations (1927) at p. 37, we find the statement:

"It is submitted that no mechanical rule based on objective facts of control or connection which will furnish a certain test is possible of formulation. Identity of stockholders, identity of officers, the manner of keeping books and records, the methods of conducting the corporate business as a separate concern or as a mere department of the other concern, may be evidential facts to be consider-

ed as bearing on the question of juggling of separate capacities and whether the subsidiary is being managed in such a way as to make the controlling corporation justly responsible. (citing cases) But after all it comes down to a question of good faith and honesty in the use of the corporation for legitimate ends. If a corporation is owned and controlled by another and is manipulated by the owner for its own purpose and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield." (Emphasis ours)

In Anderson, Limitations of the Corporate Entity (1931) 334-335, ¶ 345, the criteria are stated thus:

"Some of the controlling circumstances sustaining liability of the parent corporation are sometimes asserted to be ownership of all of the stock of the subsidiary or even a majority of the stock, coupled with control or ownership by the same persons of the stock of both the parent and subsidiary corporation . . . Of course consideration is given to the degree that the subsidiary is financed by the parent, coupled with which is the maintaining of such financing. Likewise, consideration is given where a common directorate is found functioning both corporations, as also is the case where there are common officers and employees. Decisions are influenced by the extent of the commingling of stockholders' and directors' meetings and also the extent to which both the parent and subsidiary have common transactions of business. The degree to which interests between the two are favorable one to another has an influencing effect upon holding the entities the same. The manner of bookkeeping will be looked to, but this is not a controlling circumstance. Of course, consideration will be given to the extent to which an officer or director of one corporation is permitted to dictate the policies of the other. It hardly need be said that in such decisions will be involved the character of business that such corporations are engaged in and the extent to which the trade or public generally regards the two as separate or one."

These excerpts are but suggestive; any evidence tending to show that the subsidiary exists merely as the shadow and the creature of the parent will be relevant in determining whether the two should be treated as one for the purpose at hand, and such evidence is found in the actualities of the transactions among the corporations rather than in the carefulness with which the identity of each corporation is preserved on paper.

(b)  Where the corporation is used to circumvent a statute:
Courts are not so myopic as to allow the fiction of corporate
identity to be used to circumvent a statute.  Thus in Northern
Securities Company v. United States, 193 U.S. 197 (1903) the
court struck down an attempt to avoid the intent and purport of
the Sherman anti-trust statute by recourse to the fiction of
corporate identity.  Likewise, in United States v. Milwaukee
Refrigerator Transit Company, 142 Fed. 247 (1905), the identity
of a subsidiary was disregarded when its recognition would have
resulted in the evasion of provisions of the Interstate Commerce
Act and the Elkins Act of 1903.  The same kind of action was
taken in the commodities clause cases cited supra.

Several of the excerpts quoted above have stressed the fact that
the fiction of the corporate entity of a subsidiary will be
disregarded when the recognition of this fiction would be against
the public interest or the public welfare.  It is common
knowledge that the legislature included Article 666-17(2) of the
Penal Code of Texas in the Liquor Control Act because of the
detrimental effect upon the public of the prior operation of
chain liquor stores and because of a belief that the interests
and welfare of the people of this State would best be furthered
by confining the ownership and operation of package stores to
relatively small and independent units.  Moreover, the article
expressly makes the violation of its provisions an unlawful act.
In view of the langauge contained in the Gilmore case, supra,
and approved in the Gamble case, supra, the separate identity of
a subsidiary controlled by its parent when to do so will be to
sanction an evasion of this  article, to ignore the public policy
expressed by the legislature, and to point an easy way for future
evasions by the simple act of incorporation.

While the facts submitted in and with your letter of July 27,
1942, are not sufficiently detailed and sufficiently compre-
hensive to allow this department to say as a matter of law
whether or not the Walgreen parent-subsidiary organization falls
within the two categories above discussed, you are respectfully
advised that:

(1)  If you determine that the factual inter-relationship (as
distinguished from the paper interrelationship) existing between
the Illinois Company and the five Texas companies is such as to
constitute the latter mere "adjuncts" or "business conduits" of
the former, according to the criteria above discussed, then the
Illinois Company will be guilty of a violation of the provisions
of Article 666-17(2) of the Texas Penal Code; and, under Article
666-11(2) and the definition contained in Article 666-11(9),
none of the five Texas companies will be eligible to receive a
package store permit.

(2) If you determine that the five Texas companies were organized by the Illinois Company or that they were acquired by the Illinois Company or that they are maintained by the Illinois Company as ostensibly separate organizations primarily for the purpose of evading the provisions of Article 666-17(2) of the Texas Penal Code or of subverting the public policy therein embodied, then the Illinois Company will be guilty of a violation of the provisions of this article; and, under Article 666-11(2) and the definition contained in Article 666-11(9) none of the five Texas companies will be eligible to receive a package store permit.

You are further respectfully advised that should your findings fall within either of the above mentioned categories, the provisions of Article 666-11 (2) will prevent the issuance of any package store permit to the Illinois Company for the permit period from September 1, 1942, to August 31, 1943.

Very truly yours

ATTORNEY GENERAL OF TEXAS

s/ R. Dean Moorhead

By
R. Dean Moorhead
Assistant

RDM;GO/cge

APPROVED AUGUST 26, 1942
s/ GERALD C. MANN
ATTORNEY GENERAL OF TEXAS

APPROVED OPINION COMMITTEE
By BWB, Chairman