**UNION TEXAS PETROLEUM, a Division of Allied Chemical Corp., Appellant,**

v.

**RAILROAD COMMISSION of Texas et al., Appellees.**

**No. 5036.**

Court of Civil Appeals of Texas, Eastland.

Oct. 6, 1977.

Rehearing Denied Nov. 10, 1977.

John L. McConn, Jr., Butler, Binion, Rice, Cook & Knapp, Houston, Scott & Douglas, Austin, David G. Beerbower, Division Counsel, Union Texas Petroleum, Houston, for appellant.

Joyce B. Carpenter and John David Hughes, Asst. Attys. Gen., Austin, John G. Tucker, Howell Cobb and Thomas G. King, Beaumont, for appellees.

WALTER, Justice.

Union Texas Petroleum, a division of Allied Chemical Corporation, prosecuted an appeal from the June 16, 1975 order of the Railroad Commission of Texas in Gas Utilities Docket No. 495. The order finds Union has privately negotiated industrial natural gas sales contracts at various prices and such contracts should not be modified or abrogated as to price per MMBTU "since there is no showing in this cause that the public interest would be adversely affected as required by the Court in *High Plains Natural Gas Company v. Railroad Commission of Texas*, 467 S.W.2d 532 (Tex.Civ.App.—Austin 1971, writ ref. n.r.e.)."

Allied Chemical Corporation is the real party in interest as appellant. Union Texas Petroleum and Winnie Pipeline System are divisions of Allied Chemical. Mobil Oil Corporation, Gulf Coast Machine & Supply Company and Houston Chemical Company intervened seeking to uphold the Commission's order except as to its finding that Allied's Winnie Pipeline System was a gas utility.

The trial court found that plaintiff's Winnie Pipeline System is a public utility subject to the jurisdiction of the Railroad Commission of Texas; plaintiff's gas is sold under contracts negotiated at prices substantially less than the current cost and the sales under such contracts are being made at a substantial loss to plaintiff, but that the public interest is not affected by such loss and does not require that plaintiff's contracts with intervenors be modified or abrogated as to price; and, that the order of the Railroad Commission of Texas dated June 16, 1975, in Gas Utilities Docket No. 495 is just and reasonable, and supported by

substantial evidence, and being further of the opinion that, plaintiff, having failed to show by clear and satisfactory evidence that such order is unjust and unreasonable as to it, such order should be in all things sustained.

Allied has appealed. It contends:

"Point of Error No. 1

The trial court erred in not holding that the Commission's order should be set aside because the order requires appellant to sell gas to its industrial customers at less than cost.

Point of Error No. 2

The trial court erred in not holding that the Commission's order should be set aside because the Commission erroneously held that it would not set adequate rates for a gas utility selling gas at less than cost in the absence of a showing that the nonutility assets of the gas utility are insufficient to enable it to continue in business at below cost rates.

Point of Error No. 3

The trial court erred in not holding that the Commission erred in considering assets of appellant other than those used and useful in appellant's Winnie Pipeline System gas utility business in determining not to set adequate rates.

Point of Error No. 4

The trial court erred in not holding that the Commission erred in refusing to set adequate rates on the ground that only industrial gas sales contracts with a small number of customers are involved.

Point of Error No. 5

The trial court erred in not holding that the Commission's order should be set aside because the order does not set out the basis for the Commission's refusal to set adequate rates."

Mobil's motion to be dismissed has been granted.

Houston Chemical Company and Gulf Coast Machine and Supply Company assert a cross point the court erred in concluding Allied was a gas utility. These cross points are overruled.

Allied alleged it sold and delivered gas to industrial customers and others in the vicinity of Beaumont and Port Arthur; it transported and delivered gas for public use or service for compensation; its pipelines are laid upon, over or under public highways, roads and railroad and other public utility rights-of-way, through its Winnie Pipeline System and, therefore, it was a gas utility.

Allied stipulated as follows:

". . . May it please the Court, we will stipulate that the financial responsibility of Allied Chemical Corporation in its overall operation will not be—let me back up.

I really stand here before the Court and don't know the impact of the Winnie Pipeline System's loss on Allied Chemical. I will state to the Court that it is my understanding, based on hearsay, that these losses will not impair the financial integrity of Allied Chemical Corporation as an overall entity. I will further state that we do not make that an issue here. We do not contend, for the purposes of this case, that the financial integrity of Allied Chemical Corporation in its entirety will be seriously affected by the outcome of this lawsuit."

Ralph Pruitt was employed by Allied in its Union Texas Petroleum division in charge of natural gas operations and testified substantially as follows:

Texas Gas Pipeline Corporation is a wholly owned subsidiary of Allied and is engaged in purchasing and selling gas in interstate commerce. Winnie Pipeline System is an intrastate system and has gathering lines and truck transmission lines in excess of three hundred miles. A portion of the Winnie System is used by Texas Gas Pipeline Corporation. Plaintiff's Exhibit 3 includes our five major industrial contracts, and plaintiff's Exhibit 2 under miscellaneous sales shows our other customers. The contracts of Gulf Coast Machine and Houston Chemical have expired. Gulf Coast was paying 31 cents per million BTU's when its contract expired and Houston Chemical was paying 37 cents per million BTU's.

Allied's contract with Mobil will not expire until January 1, 1982 and provides for a price of 18½ cents per million BTU's. During the year 1975, the loss sustained by Winnie Pipeline System as related to the rate base was Twenty-Four Million Thirty-Four Thousand Seven Hundred and Fifty Dollars ($24,034,-750.00).

Plaintiff's Exhibit 2 shows various miscellaneous sales. The gas sales were negotiated by our gas contract representatives. The miscellaneous sales listed in plaintiff's Exhibit 2 are, so far as volume is concerned, considered de minimis. In our curtailment plan before the Commission, we made the the representation that "Union Texas will not enter into any new contracts for the sale of gas from the Winnie System or renew any contract expiring on the system". I know that Union Texas operated profitably during each of the years of 1972 through 1974.

The contracts shown on plaintiff's Exhibit 2 were not filed with the Commission until the filing of the curtailment plan. The source of funds for Winnie was generated by the profits from Winnie until it went into a loss position and since then it has been from Texas Petroleum, a division of Allied. Texas Petroleum also gets its money from Allied. They are all Allied Chemical Corporation.

V. A. McElfresh, a director and executive vice-president of the utility consulting firm of H. Zinder & Associates, engaged in consulting work for clients engaged in the production, transmission and distribution of natural gas, testified substantially as follows:

I was asked to ascertain the revenue requirements of the Winnie Pipeline System under several conditions which involve a determination of the fair value of the property. I testified before the Commission in Docket Number 495, from which this case is appealed. My testimony before the Commission covered the fair value rate base of the Winnie System, its revenues and expenses with appropriate adjustments for cost of service. I have prepared an exhibit covering the years 1973, 1974 and 1975, showing the excess of the cost of service both with and without return and related income taxes, over the revenues actually received by the company.

Based on my 1972 information, probably all of the customers were being discriminated against because they were not paying enough and Winnie was being discriminated against because it was not collecting enough. Based on my studies, all of these contracts are discriminatory. I don't know when any of the contracts became discriminatory. When Winnie commenced delivering volumes to Firestone pursuant to a settlement agreement at no cost to Firestone, I think there was an element of discrimination there from the regulatory viewpoint of revenues equaling cost of service in an approximate amount.

He was asked the following questions and he gave the following answers:

"Q Yes, sir, I understand, and you said that the fairest way to distribute it would be to have a uniform cost.

If you had that uniform cost there would be four of these that would be subsidized in effect by the rest of them, wouldn't they, it would be the TPA plant, the Mobil (total), the Firestone, and the Texaco, all above 30.12?

A Yes, there would be only two customers whose revenue exceeded the cost of service on a uniform rate basis.

Q Who would be those two customers?

A Gulf Coast Machine and Houston Chemical.

Q They would be footing the bill, if you put it on a uniform rate basis, for the rest of them?

A In part. Overall, there would still be a deficiency of one million seven hundred and sixteen thousand dollars.

Q You don't expect them to make up the whole thing. At least on those two Allied is making a little money on them?

A That's correct."

He continued to testify substantially as follows:

I have not made a study of the five contracts involved in this case and have not made a study of Allied's contracts with Gulf Coast and Houston Chemical. Basically what I have been talking about is a rate as if it were set by a regulatory body in the beginning.

Plaintiff's Exhibit 9 shows the fair value rate base for the Winnie System and applies to property valued at a reasonable balance between depreciated original cost and reproduction cost adjusted for age and condition. Other property in the general plant is valued on a market value basis. This exhibit is not used in its entirety in the cost of service because part of this property is used by Texas Gas Pipeline Corporation. Plaintiff's Exhibit 10 covered the fair value rate base on December 31, 1972. Plaintiff's Exhibit 11 is a cost of service study and a revenue deficiency based on 12 months ending December 31, 1972, showing a revenue deficiency of $4,711,469.00. Plaintiff's Exhibit 12 shows a cost of service and revenue deficiency study for the 12 months ending December 31, 1972, and is the same as Exhibit 11 except there hasn't been the normalization to show purchases of curtailed gas and sales of curtailed gas. Plaintiff's Exhibit 13 is similar in form and content to plaintiff's Exhibits 11 and 12 although there were several changes which in my opinion are less favorable to plaintiff. Plaintiff's Exhibit 14 is similar in form and content to plaintiff's Exhibits 11, 12 and 13 in that it covers the total cost of service and revenues reflected by the books. Instead of the test year, it covers the years 1973, 1974 and 1975. (Portions of column 4 of plaintiff's Exhibit 14 were not admitted into evidence.) Plaintiff's Exhibit 15 was prepared to show the cost of service by individual customers based on the cost of service date in plaintiff's Exhibit 13 for the 12 months ending December 31, 1972.

While discussing plaintiff's Exhibit 15, the witness was asked and he answered the following questions:

"Q And if you apply the cost of service at the uniform rate developed by you, you have two customers whose revenue exceeded the cost of the service to them; is that correct?

A That's correct.

Q And those two customers were Gulf Coast Machine and Houston Chemical.

A That's right."

The witness continued to testify substantially as follows:

Mobil, Firestone, Texaco B. H., Amoco and Big Three Welding are the customers whose costs exceeded the revenue. The contract rates which Allied entered into with its various customers were discriminatory and that is shown on plaintiff's Exhibit 15.

The parties stipulated authentication of copies of documents on file with the Commission was waived and it was agreed testimony of witnesses before the Commission could be offered from the transcript of the proceedings. All pertinent records and testimony before the Commission were introduced into evidence.

Allied's annual reports for 1972, 1973, 1974 and 1975 were admitted into evidence for the limited purpose of showing the nature of Allied's overall operations, the nature of the business and the fact that Winnie Pipeline System contracts are treated as an integral part of a larger operation and the losses are more than offset by profits from other operations and for the purpose of showing the various admissions of these matters and the wholly solvent and financially capable character of the corporation.

The 1973 report reads:

"*Natural gas operations, which include domestic production and distribution (the latter including substantial sales under long-term contracts), are accounted for as a homogenous business. Accordingly, provision is not made for possible future losses on individual long-term sales con-*

tracts as long as the overall natural gas business is estimated to be profitable over the life of such contracts based on actual data as of the date of the financial statements for prices, costs, reserves and availability of purchased gas." (Emphasis added)

The 1972 report asserts:

"Our search for large new reserves of oil and gas with which to expand Allied Chemical's participation in the growing energy market is moving rapidly forward. In the North Sea and Indonesia, particularly, our Union Texas Petroleum Division has reported notable progress in recent months. Early in 1972 the division, in partnership with Occidental Petroleum Corporation, Getty Oil Company and Thomson Scottish Associates, acquired six tracts covering 316,000 acres in the British sector of the North Sea. Initial exploratory drilling began in midyear, and early in 1973, oil was discovered about 100 miles off the coast of Scotland. Further drilling was promptly begun to establish the commercial potential of the field, which covers 15,000 acres. The initial well flow tested approximately 9,000 barrels of high-quality, low-sulfur oil per day. Allied Chemical has a 20 percent interest in this new discovery, which has been named Piper Field. Another group, in which we hold a 25 percent interest, is developing a gas field in the southern sector of the North Sea and is negotiating with the British Gas Council for sale of this gas.

In Indonesia, a major gas reserve was discovered during 1972. The new Badak Field is in Kalimantan on part of 4.4 million acres of land in Kalimantan and South Sumatra covered by a contract that allots 65 percent of production to a government agency and 35 percent to a partnership of American companies. Allied Chemical owns a 35 percent interest, reducible under certain options of our partners to 26¼ percent, in the partners' share of production. Following discovery of the field, a second helicopter drilling rig was moved into Kalimantan to speed up development of this significant find, and six wells were completed by year's end. Allied Chemical also has a 30 percent working interest in a production-sharing contract that covers 900,000 acres in North Sumatra. Oil has been discovered there, and exploratory and development drilling continue. During 1972, our Union Texas Petroleum Division opened an exploration and production office in Singapore to facilitate coordination and planning for the Company's extensive Indonesian operations."

Allied's report to its stockholders made the following statements: 1972—"A reviving economy and the cumulative impact of our long-range profit improvement programs enabled Allied Chemical to achieve considerably better operating performance during 1972."; 1973—"Allied Chemical's profit performance improved sharply in 1973, and net income reached a record $3.45 a share."; and, 1974—"Allied Chemical had its most successful year in 1974, achieving substantial increases in sales and profits over previous record levels. Earnings rose from $3.45 a share in 1973—a record at the time—to $5.43 a share.".

In *Lone Star Gas Company v. State of Texas*, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304 (1937), the court said:

"The Commission's order was presumptively valid, as the state court held, but it was open to attack in this action under the state statute. Appellant was entitled to present evidence to rebut the Commission's findings of value, operating expenses, revenues and return, upon which the order rested."

In *Railroad Commission v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022 (1942), the court said:

". . . If the matter covered by the order is one committed to the agency by the Legislature, and involves the exercise of its sound judgment and discretion in the administration of the matter so committed to it, the court will not undertake to put itself in the position of the agency, and determine the wisdom or advisability of the particular ruling or order in ques-

tion, but will sustain the action of the agency so long as its conclusions are reasonably supported by substantial evidence . . ."

Prices, rates, rules and regulations and conditions of service in contracts with a gas utility are subject to change by the Commission.

Art. 6054, Tex.Rev.Civ.Stat.Ann., provides:

"All orders and agreements of any company or corporation, or any person or persons controlling such pipe lines establishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corporation, partnership or joint stock association owning or controlling or operating the gas pipe line affected. Acts 1920, 36th Leg., 3rd C.S., p. 18, ch. 14 § 3."

Allied's position is that the refusal of the Commission to modify its expired contracts with Gulf Coast and Houston Chemical constitutes confiscation as a matter of law under the United States and Texas Constitutions.

■ Allied's burden is to establish that the findings made by the Commission are not supported by substantial evidence and establish that the evidence so conclusively requires modification of the contract sales price agreement voluntarily entered into by Allied and Gulf Coast and Houston Chemical that the refusal to modify would be arbitrary and capricious. *Gerst v. Cain*, 388 S.W.2d 168 (Tex.1965).

In *Railroad Commission v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022 (1942), the court said:

". . . In Texas, in all trials contesting the validity of an order, rule or regulation of an administrative agency, the trial is not for the purpose of determining whether the agency actually heard sufficient evidence to support its orders, but whether at the time such order was entered by the agency there then existed

sufficient facts to justify the same. Whether the agency heard sufficient evidence is not material. In fact, the evidence heard by the agency is not per se admissible upon the trial in the district court. Whether it is admissible upon the trial in the district court must depend upon its own merits under the general rules of evidence, and without regard to whether it had theretofore been introduced before the agency . . .

The Commission contends the only issue involved is whether modification of the contract sales price agreements between Allied and Gulf Coast and Allied and Houston Chemical would be in the public interest as defined in *High Plains Natural Gas Company v. Railroad Commission of Texas*, 467 S.W.2d 532 (Tex.Civ.App.—Austin 1971, writ ref. n.r.e.).

Gulf Coast and Houston Chemical say, "It is no longer an open question in Texas that the Railroad Commission has the authority to set aside the provisions of such contracts only if there is a positive showing that such modification is required by the public interest."

In Allied's petition, it asks for relief under Article 6054, but it does not allege such relief would be in the public interest.

In *High Plains Natural Gas Company*, supra, the court said:

". . . High Plains showed that the contract price yielded a rate of return of only 2.987. This is not only unquestionably far below a reasonable rate of return, but it is confiscatory under the standard set in the *Alvin* case. The *Alvin* case referred to is *Railroad Commission v. Houston Natural Gas Corporation*, 155 Tex. 502, 289 S.W.2d 559 (1956). The *Alvin* case is not in point here as it was a rate case wherein the rate making jurisdiction of the Commission was invoked thus compelling the Commission to set a reasonable rate under the applicable guidelines. The standard applicable there is not the same as here. The case before us is not a rate case . . ."

Mobil participated in the trial of this case as an intervenor. Most of the damaging testimony of appellant's expert witness, V. A. McElfresh, was directed against Mobil's long-term contract which had not expired. In plaintiff's Exhibit 15, schedule number 3 showing a comparison of revenues with cost of service for 12 months ending December 31, 1972, we find Gulf Coast's revenue in excess of cost was $2,591 and Houston Chemical's revenue in excess of cost was $128,456, while Mobil's total revenue was $1,753,001 and its cost of service was $2,812,386. This shows the cost of service in excess of revenue from Mobil to be $1,059,385. All issues between Mobil and Allied have been compromised and settled, Mobil has been dismissed, and all issues shown in this record between Allied and Mobil are moot.

In *High Plains Natural Gas Company*, supra, the court said:

"Thus it becomes apparent that Appellant has neither alleged in its pleadings nor offered substantial evidence to indicate that the contract rate should be set aside in the public interest. While the evidence may indicate a bad bargain or a rate less than the Commission, were it to have jurisdiction, could lawfully set the public interest test as stated in *Sierra* simply had not been met."

We have considered only the evidence relating to the contract between Allied and Gulf Coast and Allied and Houston Chemical. We find that Allied has not discharged its burden of establishing the findings of the Commission are not supported by substantial evidence. It has failed to plead and establish by substantial evidence the abrogation of these contracts is in the public interest.

We find no merit in appellant's point the court erred in not holding the Commission's order should be set aside because the order does not set out the basis for its refusal to set adequate rates. Allied contends Section 16(b) of Article 6252–13a, V.A.C.S., the Administrative Procedure and Texas Register Act, requires the Commission to make findings of fact and conclu-sions of law. Said Section 16(b) is as follows:

"(b) A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings. If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling on each proposed finding. Parties shall be notified either personally or by mail of any decision or order. On written request, a copy of the decision or order shall be delivered or mailed to any party and to his attorney of record."

The order of the Commission is dated June 16, 1975, and the Administrative Procedure Act did not become effective until January 1, 1976.

We have considered all of appellant's points and find no merit in them. They are overruled.

The judgment is affirmed.