**WRIGHT TITUS, Inc., v. SWAFFORD.**

No. 8828.

Court of Civil Appeals of Texas. Austin.

Oct. 11, 1939.

On Offer of Remittitur Nov. 1, 1939.

Rehearing Overruled Nov. 1, 1939.

288

Ely Straus, of Dallas, for appellant.

Walter Greig and Cofer & Cofer, all of Austin, for appellee.

BLAIR, Justice.

Appellee, J. B. Swafford, sued appellant, Wright Titus, Inc., a corporation, and H. B. Cook for damages for the conversion of his Ford automobile, and for the actual or intrinsic value of personal property which was in the automobile at the time of its conversion. Cook was alleged to have taken the automobile as agent of appellant; that he acted maliciously in so doing, that appellant ratified the malicious act, and for which exemplary damages were sought. Appellee also alleged that the note held by appellant and secured by a chattel mortgage on the automobile provided for $100 usurious interest, and sought to have that amount considered in connection with the offset of indebtedness against the value of the automobile converted by appellant. A jury trial upon special issues resulted in a verdict and judgment for appellee against appellant and Cook, jointly and severally, for $1,371.50. Cook has not appealed, and as to him the judgment is affirmed.

The litigation arose as follows:

Appellant, Wright Titus, Inc., owned a note for $476, executed by appellee, J. B. Swafford, and secured by a chattel mortgage on a Ford automobile. The note was payable in weekly installments; and the mortgage provided that failure to pay any installment when due, or the removal of the property from Dallas County without appellant's consent, would authorize it to declare the note due and to foreclose the mortgage, and sell the automobile at public or private sale without notice. Appellee failed to pay the third installment, which

was due about May 24, 1937, and did not thereafter pay any installment when due, but paid a total of 16 payments of from $7.50 to $15 twice or three times each month, the last payment of $10 being made October 23, 1937, after which payment the total of the installments was in arrears about $12, and at which time a balance of $331 was due on the note, according to the record of payments kept by appellant. Appellant claimed to have declared the note due October 4, 1937, but did not notify appellee of that fact, and receipted him for two payments of $10 each after that date, the last receipt bearing date October 23, 1937, and being for payment in "cash" by appellee at the office of appellant; and on that date appellant first alleged it had sold the automobile, but by amendment and by testimony at the trial claimed to have foreclosed the mortgage lien and sold the automobile to itself at private sale, without notice, October 25, 1937, claiming that right because of the default in the payment of the installments when due, and because appellee had taken the automobile out of Dallas County without the consent of appellant. After making a payment of $10 on the note October 23, 1937, appellee came to Austin on October 25th or 26, 1937, seeking employment; and on November 3, 1937, wrote appellant as follows:

"I am in Austin trying out a new job, and want to advise you that I will be in Dallas Saturday of this week and make two payments on my car.

"I don't know if I will continue with this position here as I have one in Dallas and I am here trying this one out for 30 days.

"Assuring you of making two payments Saturday of this week."

On the same day, November 3, 1937, H. B. Cook, who was temporarily engaged in locating and repossessing automobiles for finance companies, having seen a letter of appellant seeking to locate appellee's automobile, approached appellee and told him that he was the agent of appellant and wished to repossess the automobile because of the indebtedness due against it; whereupon the following agreement was entered into:

"Austin, Texas Nov. 3, 1937
"Know All Men By These Presents—

"I, H. B. Cook, do as authorized by power vested in me by Wright-Titus Finance Co. of Dallas, do hereby agree to store 1936 Ford V 8-Tudor Touring 293-122 and hereby agree to Mr. Swafford that in event

we are unable to refinance at some reputable Co in Austin by 6 p. m. 11/4/37 Mr. Swafford may have possession of same for 10 days to have opportunity to refinance same himself.

"Signed: Harold B. Cook
J. B. Swafford."

Cook represented to appellee that there was some $335 due against the car, and that four payments were past due. Cook and appellee then called Mr. Titus, president of Wright Titus, Inc., by telephone, and discussed the settlement of the amount due; and Mr. Titus agreed that $335 was due, and that if Swafford paid Cook $335 the company would release the automobile, which was then in the possession of a garage in Austin, Cook holding the storage check therefor. The automobile was stored in the Powell Garage under agreement; but was on the same day removed by Cook to the Motoramp Garage, without the knowledge or consent of appellee. On the 4th of November, Cook and appellee together sought to refinance the loan of $335 on the automobile, but did not do so. However, on the same day appellee obtained a loan from the Fidelity Trust Company, in Austin, and Patterson Tearle gave him a certified check for $335, to be placed in the American National Bank, with which to pay the mortgage debt. On the following day, November 5, 1937, Cook received the following telegram from appellant:

"H. B. Cook,
"Austin, Tex.
"Net amount including your fee to clear Swafford $340.
"Wright Titus-Templeton."

On the same day, November 5, 1937, Cook, Tearle, and appellee went to the bank and put the money in the form of a cashier's check in the bank. Mr. Williams, Cashier of the bank, then, on the same day, November 5, 1937, wrote a letter to appellant, as follows:

"Referring to the J. B. Swafford account I am authorized to pay you $335.00 (three hundred thirty-five dollars) on receipt of all papers, including insurance policy and a release of mortgage on car, properly executed. Your prompt attention will be appreciated."

This letter was delivered to Cook; and the parties then arranged to store the automobile until the settlement was consummated in the Motoramp Garage, in the name of Patterson Tearle. Cook agreed to all these arrangements, and the automo-

bile was stored under the following agreement:

"To the Motoramp Garage:

"I hereby authorize the Motoramp Garage to deliver to Patterson Tearle one 1936 Ford Tudor Sedan Check No. 33-887 License No. 293-122 on presentation of release of mortgage held by Wright Titus Company of Dallas.

"(Signed) H. B. Cook, Adj.
Wright Titus Co."

About an hour and a half after this agreement was made, Cook went to the garage and under false representations, and upon a receipt purporting to have been signed by Patterson Tearle, obtained possession of the automobile. Tearle testified that the receipt had his name signed to it, but that he did not sign it. Cook then took the automobile to Dallas and turned it over to appellant on Monday, after he had gotten it on Saturday. Also, on Monday the attorney for appellee, after learning that the automobile had been taken to Dallas, called appellant by telephone and informed it fully of the agreement with Cook, and what had occurred. Appellant's agent, Mr. Templeton, who handled the account for appellant, told the attorney that the automobile had been delivered to it, but refused to return the automobile unless appellee would pay the additional expense incurred in delivering the automobile to Dallas, and requiring that appellee come to Dallas for the automobile. This appellee refused to do because appellant's agent had wrongfully taken the automobile in violation of the agreement. After appellant was thus informed of the settlement agreement made by Cook as its agent, and of the deposit of the money in the American National Bank to pay appellee's debt to it, and of Cook's breach of the agreement by taking possession of the automobile, it, through its president, Mr. Titus, and on the same day, Monday, November 8, 1937, paid Cook $25 as reward for repossessing and delivering the automobile to it at Dallas, which it kept and later sold, claiming to have theretofore, on October 23, 1937, purchased the automobile itself at private sale under the mortgage, bidding therefor the balance due on appellee's debt, which was $331. Thus appellant obtained the automobile, valued by the jury at $475, for $331, plus the $25 reward, or a total of $356, with full knowledge of the settlement agreement and Cook's breach of it.

■ The facts above detailed fully support the jury's findings that Cook acted as the agent of appellant, and within the scope of his authority, both in making the settlement agreement with appellee and the bank, and in taking possession of the automobile and delivering it to appellant in Dallas; and that appellant authorized and ratified all of Cook's acts, including the acts found to have been maliciously done in taking possession of and delivering the automobile to appellant at Dallas; and the contentions of appellant to the contrary are not sustained. We will later discuss the contention that the evidence failed as a matter of law to show that appellant ratified the malicious acts of Cook, the agent, in repossessing the automobile, under questions relating to exemplary damages.

By several propositions appellant contends that since it sold the automobile at private sale to itself under the power of the mortgage prior to the time Cook took possession of and delivered same to appellant, it was not guilty of conversion of the automobile, because it owned the same. In the alternative, appellant contends that if the sale were illegal, then it took possession of the automobile under the power given in the mortgage, and was therefore not guilty of conversion of it.

■ Appellant by pleadings set up as defenses to appellee's suit for conversion of the automobile that it was the owner of the same, or, in the alternative, that it was the mortgagee with right of possession under the mortgage; but it did not request the submission of these defenses to the jury, and in consequence waived them unless the evidence established them as a matter of law, which it did not do. On the contrary, the above detailed facts fully support the theory of recovery plead by appellee.

Briefly, appellee contends that the transactions stated amounted in law to novation; that his original obligations on the note and mortgage were discharged; and that the mortgagee was therefore guilty of conversion in taking possession of and converting the automobile to its own use.

■ A clear statement of the law of novation applicable is found in Vol. 2 of Restatement of the Law of Contracts, p. 805, sec. 428, as follows: "Where a third person contracts with a debtor to assume,

as an immediate substitution for the debtor's duty, a duty to the creditor to render either the performance for which the debtor was previously bound, or some other performance, and the creditor agrees either with the debtor or with the third person to such substitution, there is a novation that discharges the original debtor and subjects the third person to a duty to the creditor."

■ The facts in the instant case show the simplest form of novation. Appellee owed appellant company a debt, secured by a mortgage on an automobile. He secured the money from a third person to pay the debt, and placed it in the bank, which agreed to pay the debt of appellant upon receipt of the note, mortgage, insurance policy, and a release of the mortgage lien. Appellant accepted the obligation of the bank to pay the debt, and stored the automobile in the Motoramp, under the agreement that it would be delivered to the third party who furnished the money to pay the debt, upon his presenting the release of the mortgage when executed by appellent and delivered by it to the bank. Thus the debt of appellee to appellant was completely discharged, and appellant accepted and acquired the promise of the bank to pay the new obligation upon receipt from appellant of the papers and release of the mortgage as agreed to between the bank, appellant, and the third party. These facts constitute a novation. See 31 Tex.Jur., 338, sec. 6, and cases there cited.

■ Nor do we sustain the contention of appellant that there was no novation because the agreement was conditional, in that appellant was required to deliver the insurance policy, the note, the mortgage, and a proper release of the mortgage before the money would be paid to it by the bank. The settlement of the note and lien was not conditional because the party who held the note and lien was required to execute and deliver the note and a release of the lien, and because the party who agreed to deliver the papers and execute the release did not do so. A similar question was decided in the case of Meador v. Rudolph, Tex.Civ.App., 218 S.W. 520, where a deposit was made in a bank to be paid upon the outcome of a law suit. The court held that the deposit to be paid upon the happening of a contingency created a novation.

■ Nor was the obligation conditional as between appellee and appellant. It was a new obligation between appellant, the bank, and Tearle, whereby they agreed that appellant would deliver the papers and release to the bank, which in turn would deliver them to Tearle so that he might obtain the release of the automobile under the storage agreement executed by appellant and Tearle as a part of the novation agreement. Appellee had no obligation to perform either under the substitution of the new debtor (the bank) agreement, or under the storage agreement. His obligation to appellant was completely extinguished, and his rights in the automobile as between himself and the third party who furnished the money to pay appellant were not involved, because in order to constitute novation, "it is immaterial what consideration the original debtor gives for the promise of the third person to assume the indebtedness." Vol. 2, Restatement of the Law of Contracts, p. 805.

■ Nor do we sustain the contention of appellant that the effect of the agreement was a mere extension of time for the payment of the debt of appellee to appellant, and that the agreement based solely upon the extension of time of payment of the past due note is without consideration. The agreement was not for an extension of time to pay the debt, but was the arrangement made whereby the bank promised to pay the note upon the delivery of the papers and release of the mortgage; and the agreement extinguished the indebtedness as between appellant and appellee, and substituted the bank as the debtor. The law is well settled that where a new debtor is substituted and accepted by the creditor, who agrees to discharge the original indebtedness, such agreement is based upon valuable consideration. The novation in such case consists in the mutual agreement substituting the new debtor for the old one in consideration of the extinguishment of the debt. Commercial Natl. Bank v. Poulos, Tex.Civ.App., 8 S.W.2d 222; Farmers' State Bank v. Cottingham, Tex.Civ.App., 261 S.W. 426.

■ By several propositions appellant contends that the trial court erred in refusing to instruct a verdict for it on the issue of exemplary damages, contending that the evidence did not show that Cook acted maliciously, or that appellant ratified the malicious acts of Cook, in taking the automobile in violation of the settlement agreement. That Cook acted maliciously and wilfully in taking possession of the

automobile, in violation of the settlement and storage agreements, is fully established under the above detailed facts. He knew that he had no right to the possession of the automobile, and obtained possession through false representations or forgery. His fee under the settlement agreement was $5, but the reward offered by appellant and paid to him for the recovery of the automobile was $25. From these facts the jury could also have reasonably concluded that Cook breached the agreements upon the improper motive of obtaining the larger reward rather than the lesser settlement fee. The law is settled in this state that exemplary damages are recoverable for the wilful or malicious taking of personal property; or the taking of it under circumstances showing improper motive. The law is also settled that a corporation is liable for exemplary damages occasioned by the wilful or malicious act of its agent taking possession of personal property for the corporation, where it either authorized the act or subsequently ratified or approved it, with full knowledge of the facts. Union Deposit Co. v. Moseley, Tex.Civ.App., 75 S.W.2d 190. The facts above detailed show that appellee's attorney by telephone fully informed appellant of the settlement and storage agreements, which it had authorized Cook to make as its agent; and of the deposit of the money in the bank to pay appellee's debt to it; and of Cook's breach of the agreements by wrongfully taking possession of the automobile; but notwithstanding its knowledge of the settlement and storage agreements, it accepted the automobile from Cook and paid him the $25 reward it had offered for the automobile, and kept the automobile under claim of ownership, which was contrary to the right of only a mortgagee as claimed in the settlement agreement. Thus appellant, with full knowledge of all the facts, ratified and approved the acts of Cook in breaching the settlement and storage agreements, and in wrongfully taking possession of the automobile; and appellant obtained property valued by the jury at $475 for $356.

The case of Wardman-Justice Motors v. Petrie, 59 App.D.C. 262, 39 F.2d 512, 69 A.L.R. 648, is analogous. There the vice-president of a corporation, claiming to have a lien upon an automobile which it did not have, directed an employee or agent to seize the automobile. The court held that a corporation is liable for exemplary damages where it appears that it wrongfully took possession of an automobile through an agent, and where the agent's act was either authorized or subsequently ratified by the officer of the corporation having authority to speak for it. Texas cases are numerous which hold that a corporation is liable for the wilful or malicious acts of its agents where it either directs the acts or subsequently ratifies or approves them with full knowledge of them. Winnt v. I. & G. N. R. Co., 74 Tex. 32, 11 S.W. 907, 5 L.R.A. 172; St. Louis Southwestern R. Co. v. Thompson, 102 Tex. 89, 113 S.W. 144, 19 Ann.Cas. 1250; 13 Tex.Jur. 250, sec. 139.

The definitions of "malicious" and "wilful" in connection with the issue submitting exemplary damages were those ordinarily given in court charges, and the refusal to give the several requested charges of appellant was not error for three reasons: (1) because they were general charges and not permissible in a special issue case; (2) because they submitted matters relating to the law of "gross negligence," and were not applicable to the instant case, wherein liability was predicated upon wilful and intentional wrong of an agent of a corporation, which the corporation ratified or approved with full knowledge of same; and (3) because those not objectionable were fully covered by the court's instructions to the jury on the same matters.

In submitting the issue of exemplary damages, the court instructed the jury as follows: "In this connection you are instructed that punitive damages may be assessed as punishment for a wrongful act done, if any, if the facts warrant the same. In awarding such damages, if any, you may consider mental distress and suffering, if any, of the plaintiff, the sense of wrong and insult, if any, to which plaintiff was subject as a result of the wrongful acts, if any. You may consider his loss of credit, if any, and the loss of his job, if he did lose it, as a result of the wrongful acts, if any. The amount to be fixed, if any, is in the sound discretion of the Jury."

This was objected to because not covered by pleadings or proof. The pleadings were not excepted to on this ground, and the evidence fully sustained the action of the court in submitting these elements of exemplary damages for the jury's consideration. Appellee was engaged in the

neon sign business, and an automobile was necessary; that without it he could only obtain employment on a commission basis and at a loss; that his credit was injured, and that he could not make even a down payment on another automobile. The allowance of exemplary damages is in the nature of punishment of the wrongdoer and as an example for the good of the public, and such damages may also cover losses which are too remote to be considered under a claim of actual damages, such as injury to feelings, loss of business, mental suffering, and other similar losses; and the amount of such damages is within the sound discretion of the jury. Southwestern Gas & Electric Co. v. Stanley, Tex.Civ.App., 45 S.W.2d 671; Anderson v. Alcus, Tex.Civ.App., 42 S.W.2d 294; Morton Salt Co. v. Wells, Tex.Civ.App., 35 S.W.2d 454; Universal Credit Co. v. Ratliff, Tex.Civ.App., 57 S.W.2d 238; 13 Tex.Jur., 238, sec. 131; 15 Amr.Jur. 740. In the instant case the jury allowed $560 as exemplary damages, and its discretion in the matter will not be disturbed.

■ In framing its special issues the court referred to the automobile either as the "car in question" or as "plaintiff's car," or "automobile." This was objected to as assuming a disputed issue of fact in the case. If the reference made to the automobile as "plaintiff's car" or "automobile" is not merely descriptive, the error is harmless, because if the settlement contract were made as found by the jury, then appellant and appellee admitted that the automobile belonged to appellee. The defense that appellant was owner of the automobile under the private sale to itself without possession was not submitted nor requested to be submitted to the jury and was waived as a defense to appellee's claim of ownership. Appellant offered no proof under its alternative plea that it took possession of the automobile as mortgagee; but to the contrary claimed to be the owner under the alleged oral sale to itself, which was contrary to the claim set up in the subsequent settlement agreement, wherein its claim was only that of a mortgagee holding a $335 indebtedness secured by a lien on the automobile, which it expressly contracted to release. Thus the title of appellee to the automobile was established as a matter of law, and if the issues assumed such fact such assumption was harmless.

■ The jury found that the market value of the automobile at the time of the conversion was $475. This finding is attacked as not being supported by evidence. Appellee testified that he knew the reasonable cash market value of the automobile both in Austin and in Dallas; that he had purchased and sold automobiles, and knew the price of similar automobiles in Austin and Dallas; and that the reasonable cash market value of the automobile was $550 or $600. Appellant contends that because appellee only paid $535 for the automobile, his testimony was not worthy of belief. He testified that he thought he got a bargain in the automobile. This merely affected his credibility, and was a matter for the jury to determine.

■ The jury found that certain silverware, family pictures, business records, and business pictures were in the automobile when it was converted by Cook as agent of appellant. This finding is attacked as not being supported by any evidence. Appellee and his wife fully explained the reason and circumstance for this property being in the automobile; and positively testified that it was in the automobile when Cook first took it, and appellee testified that he later saw the property in the automobile in the garage where stored, Cook holding the storage ticket; and that Cook thereafter had continuous control of the automobile until he finally converted it and delivered it to appellant at Dallas. This evidence sustains the jury's finding.

■ Under a proper definition of "actual damages" the jury found the value of the silverware converted to be $75. This finding is attacked upon the ground that it had no support in the evidence, and particularly upon the ground that appellee testified that the silverware had a market value, but that he had neither pleadings nor evidence to support such measure of damages.

The silverware consisted of odd pieces, to-wit: "One fruit dish, one silver tray, one silver gravy bowl, and certain other small pieces of silver," and was given to appellee and his wife some three or four years previously as wedding presents. Appellee alleged and testified that the second-hand silverware had no market value. He further testified that an investigation showed that it would cost more than $100 to replace the silverware. This evidence

**296**

sustains the jury's finding of $75 actual value. Houston & T. C. R. Co. v. Ney, Tex.Civ.App., 58 S.W. 43, 13 Tex.Jur., 153, sec. 66.

■ It is true appellee stated on cross-examination that some of the pieces of silverware had a market value, but we think the entire evidence could be considered, and that the jury could have reasonably concluded that he was not attempting to distinguish market value in its legal sense from actual value of the silverware. The court judicially knows that odd pieces of secondhand table silverware do not ordinarily have a market value.

■ The jury found that the family pictures in the automobile at the time of its conversion had an intrinsic value of $50. Appellee and his wife described the pictures, testified that some of them were more than 50 years old and could not be replaced; and appellee further testified that by his pleadings he had estimated the value of the pictures at $50, which evidence sustains the jury's finding.

■ The jury found that the business records in the automobile at the time of its conversion had an actual value of $150. This is attacked as not being supported by any evidence as to amount of the damages. Appellee showed that this record consisted of some 150 names of persons or firms for whom he had made neon signs; that it was impossible to replace them; and on cross-examination testified: "Well, it ought to be worth $200 to anybody, as a salesman in my line of business." This evidence supports the jury's finding of $150 value for the business record.

■ The jury found that the business pictures in the automobile at the time of its conversion had an actual value of $300. This finding is attacked as not being supported by any evidence as to the amount of such damages. This contention is sustained. Appellee testified that the pictures were of neon signs made by him in four states, and covered an accumulation of four or five years, and were used constantly as advertisements in his business; and that it would entail large expense to retake the pictures. However, he made no estimate as to the expense necessary to retake the pictures, nor of any value of the pictures to him. The jury were given no basis of calculation upon which to fix the amount of the damages; and its finding

of $300 damages cannot stand. 13 Tex. Jur. 154.

■ With respect to the $100 allowed as usury, we think appellee was not in a position to assert the claim. He based his suit upon the settlement agreement, in which he acknowledged the amount of appellant's debt to be $335; and obtained the promise of the bank to pay appellant that amount. The bank became the new obligor to appellant for the $335, and appellee thereby extinguished his debt and mortgage to appellant. The $100 claimed to be usurious interest was a part of the consideration for the settlement agreement which is the basis of appellee's suit, and he can not rely upon that agreement and deny the consideration, or any part of it, for the agreement.

■ We also sustain appellant's contention that the mere finding of the jury that appellee obtained only $376 on the $476 note did not establish that $100 represented usurious interest. Issues of fact were raised as to whether the $100 represented an agreed carrying charge, insurance, and interest. There was no jury finding on these disputed items relating to the issue of usury and the amount thereof, if any.

■ Appellee's counsel started to make the argument to the jury that "it was all right for them to rob this man." Appellant objected, and the court stopped the argument and instructed the jury to disregard it. If any error were presented by such argument, the trial court instructed the jury to disregard it, and there is nothing in the record to show that they did not do so. The fair deduction, however, is that Cook did try to rob appellee of his automobile. After making a fair agreement to settle appellant's debt in full by placing the money in the bank, to be paid upon release of the mortgage, which arrangement appellant accepted, Cook by false representations or forgery unlawfully took possession of the automobile and delivered it to appellant, who kept it after being informed of the settlement agreement, of Cook's breach of it, and his conduct in taking the automobile. While the word "rob" when used in a certain sense means that property is taken by violence; in another sense it is used as meaning to deprive one of property unjustly, or injuriously; and since Cook took the automobile by false representations or forgery,

he certainly unjustly deprived appellee of it. In any event, the court instructed the jury to disregard the statement, and no reversible error is shown.

Since the court improperly allowed $300 for the business pictures, and the $100 for the usury claim, the judgment against appellant, Wright Titus, Inc., must be reversed. If, however, appellee should file a remittitur of $400, the judgment will be accordingly reformed and affirmed.

Affirmed as to H. B. Cook, reversed as to Wright Titus, Inc., with suggestion of remittitur.

### On Offer of Remittitur.

A remittitur of $400 having been filed by appellee in accordance with the suggestion made in our original opinion, the portion of the judgment remanding the cause is set aside, and the judgment of the trial court is reformed and affirmed so that appellee recover of and from appellant, Wright Titus, Inc., the sum of $971.50, and that appellee shall pay all costs.

Reformed and affirmed.