**HOUSTON–AMERICAN LIFE INSURANCE CO. et al., Appellants,**

v.

**Eleanor M. TATE, Appellee.**

No. 3985.

Court of Civil Appeals of Texas.

Waco.

May 24, 1962.

Affirmed as Reformed on Remittitur May 31, 1962.

Rehearing Denied June 28, 1962.

**646**

Irion, Cain, Cocke & Magee, Don W. Davis, Dallas, for appellants.

Fritz & Vinson, Edward R. Vinson, Dallas, for appellee.

TIREY, Justice.

This action was brought originally by Millard C. Tate for actual and exemplary damages he claimed to have sustained to himself and to his wife because of the wrongful conduct of the appellants in seeking to enforce the provisions of a usurious contract. Before the trial his wife filed a suggestion of death stating that her husband had died and alleged that she was his surviving widow; that under his will she was named the sole beneficiary and independent executrix without bond. She alleged that the cause of action is one which survives, and she asked the Court that the suit be continued in her name, namely Eleanor M. Tate, in her own right, and as independent executrix of the estate of Millard C. Tate, plaintiff. The Court granted this motion and entered an order in accordance with the request. The Court overruled appellant, Houston-American Life Insurance Company's motion for severance and submitted the cause to the jury. The verdict was favorable to plaintiffs. The jury fixed the actual damages in behalf of Mrs. Tate and her husband at $100.00 each, and awarded the sum of $6300.00 as exemplary damages. The Court overruled each of appellants' motions for judgment and for remittitur, and granted plaintiff's motion on the verdict of the jury and decreed to Mrs. Tate in her own right and as independent executrix of the estate of Millard C. Tate, deceased, against the defendants, jointly and severally: (1) cancellation of $50.61 usurious interest contained in the promissory note of September 21, 1956, (2) and awarded to her $196.33 insurance benefits, (3) and $200.00 actual damages for mental or emotional pain and physical illness suffered by Eleanor M. Tate and Millard C. Tate, deceased, and (4) $6300.00 exemplary damages for malicious harassment, with interest on the sums specified in (2), (3) and (4) above, at the rate of 6% per annum from the date of this judgment, and (5) all court costs in this cause incurred. The judgment is assailed on 13 Points. 1 and 2 are to the effect that judgment for exemplary damages does not survive the death of the injured party, and that plaintiff failed to request and obtain the submission of a separate issue inquiring as to exemplary damages relative to the surviving plaintiff only, and that since exemplary damages do not survive in behalf of the deceased husband, there is no way in which the Court can split the exemplary damages here awarded because it was submitted in one issue. Issues 21, 28 and 30 are pertinent to the above Points. 21 is: "Do you find from a preponderance of the evidence that the said unreasonable collection efforts, if any, by Houston-American Finance Corporation against Eleanor M. Tate were actuated by

malice, as that term is defined herein?" To which the jury answered "Yes". "28. Do you find from a preponderance of the evidence that the said unreasonable collection efforts, if any, by Houston-American Finance Corporation against Millard C. Tate were actuated by malice, as that term is defined herein?" To which the jury answered "Yes." Issue 30: "What sum of money, if any, do you find from a preponderance of the evidence should be awarded plaintiff as exemplary damages for the malicious collection efforts, if any, of Houston-American Finance Corporation, against Millard C. Tate and Eleanor M. Tate?" To which the jury answered "$6300.00." Defendants only objection to Issues 21 and 28 is: "that the same is wholly without support in the evidence." There is no objection to Issue 30. Article 5525 Vernon's Ann.Tex.Civ.St., provides that:

"All causes of action upon which suit has been or may hereafter be brought for personal injuries, or for injuries resulting in death, whether such injuries be to the health or to the reputation, or to the person of the injured party, shall not abate by reason of the death of the person against whom such cause of action shall have accrued, nor by reason of the death of such injured person, but, in the case of the death of either or both, all such causes of action shall survive to and in favor of the heirs and legal representatives and estate of such injured party and against the person, or persons liable for such injuries and his or their legal representatives, and may be instituted and prosecuted as if such person or persons against whom same accrued were alive."

Rule 150 Texas Rules of Civil Procedure provides in effect, where the cause is one which survives, no suit shall abate because of the death of any party thereto. In Norman v. Valley Gin Co., (Tex.Civ.App., 1936), 99 S.W.2d 1065, writ ref., the Beau-mont Court, in considering this statute stated:

"Under this statute, the cause of action that survives is for damages for injuries received by the injured party, which, if he lives, may be recovered by him, but, if he dies from the injuries, then his heirs and legal representatives have the right to recover the same damages that the injured party, had he lived, could have recovered. That is, his right to recover damages because of the injuries which he has suffered up to the time of his death, survives to his heirs, legal representatives, and estate. The value of his life, measured by his earning power during the period of his life expectancy, is not the estate, the right to recover which is provided by the statute."

We see no conflict in the Beaumont Court's opinion with the Texarkana Court in Fleming Oil Company v. Watts, Tex.Civ.App., 193 S.W.2d 979, writ ref., n. r. e. However, if there should be, the Beaumont opinion would control because of the straight out refusal, and because our Supreme Court has not changed or modified the statement of the Rule there made. See also 33 Tex.Jur. 179. In Vol. 1 C.J.S. Abatement and Revival § 138, p. 190, we find this statement:

"* * * ordinarily where a cause of action ex delicto survives the death of person injured, it survives in its entirety so as to entitle the personal representative to recover exactly the same damages as his decedent might have recovered."

In 1 Am.Juris., Sec. 89, (pocket part) we find this statement of the Rule:

"In a majority of cases considering the question, the view has been taken that where an action in which exemplary damages might properly be allowed has been begun by the injured party himself, his later death does not preclude recovery of such damages by his

personal representative, assuming, of course, that circumstances justifying the allowance of punitive damages generally are adequately established."

It is true that we have not been cited to any case in Texas where any of our Appellate Courts have held that a cause of action (similar to this one) for exemplary damages survives. However, the question has been passed upon by the Supreme Court of Vermont where the survival statute is very similar in many respects to our Art. 5525, R.C.S. The Vermont statute, Gen.St., c. 52 § 11, provides as follows:

"If, in any proper action now pending, or which may hereafter be commenced, for the recovery of damages for any bodily hurt or injury, occasioned to plaintiff by the act or default of defendant * * *, either party shall decease during the pendency of such action, such action shall, nevertheless, survive, and may be prosecuted to final judgment by or against the executors or administrators of such deceased party."

In Bradley v. Andrews, Supreme Court of Vt., 51 Vt. 525, the father instituted a suit in behalf of his minor son for injuries sustained when the defendant shot the boy with a Roman Candle. The son died before the trial, and the defendant contended the cause of action abated by reason of the son's death, and the Supreme Court held that under the above statute quoted that the cause of action survived in favor of the father as administrator, both as to actual and exemplary damages. Again in Earl v. Tupper, 45 Vt. 275, we have this situation: Mr. and Mrs. Earl had brought suit for actual and exemplary damages on account of Mrs. Earl having been beaten by the defendant with a stick. Mrs. Earl died during the pendency of the suit. Her husband prosecuted the suit to completion and recovered actual and exemplary damages. The Court, in discussing exemplary damages, said:

"But, as has been stated before, such damages are given to stamp the condemnation of the jury upon the acts of the defendant on account of the malicious or oppressive character of the acts, and the decease of the party injured would not take away the bad character of the acts, nor prevent the jury from holding them in detestation nor take away their right to visit the defendant with damages to show what might be expected from similar conduct."

In 17 Tex.Jur.2d at page 241, we find this statement:

"Although the Courts declare that exemplary damages are not compensatory in character, nevertheless they are, in some aspects, compensatory, for they are payment to the sufferer in an attempt to compensate him for his sufferings."

In Cole v. Tucker, 6 Tex. 266, we find this statement by Chief Justice Hemphill:

"It is only by legal fiction that the plaintiff suing for exemplary damages represents the public."

In Allison v. Simmons, Tex.Civ.App., 306 S.W.2d 206, n. r. e., this Court approved the following definition of exemplary damages:

"Compensation allowed by law in addition to actual damages by way of punishment, and as an example for the good of the public, and may also include compensation for inconvenience, reasonable attorney's fees, and other losses too remote to be considered under actual damages."

Citing Wright Titus, Inc. v. Swafford, Tex. Civ.App., 133 S.W.2d 287, dis. correct judgment; Union Mill Co. v. Prenzler, 100 Iowa 540, 69 N.W. 876. Testimony was tendered to the effect that reasonable attorney's fees in this cause were $2330.33.

■ Going back to Article 5525 aforesaid, we find that the terms of this statute are very broad, comprehensive and inclu-

sive. If the Legislature had intended that the cause of action for exemplary damages should not survive the death of the injured party, it could have easily made the exclusion. It is our view that if we held that the action for exemplary damages did not survive, that we would be grafting an exception on the statute, which we are not authorized to do. There is another reason why we think the action for exemplary damages survives. First of all, the Supreme Court of Texas has uniformly held that counsel fees for the prosecution of plaintiff's demand in cases of tort "may be considered by the jury, in a proper case, in fixing the amount of exemplary damages." See also Allison v. Simmons, supra, and cases there cited. The Legislature of Texas has the power and corresponding duty to fix the public policy of this state. The only limitation on such authority is the Constitution of Texas, and the Constitution of the United States. Moreover, in Texas Employers' Ins. Ass'n v. Holmes, 145 Tex. 158, 196 S.W.2d 390, point page 395, we find:

> "Where a statute which has been construed, either by a court of last resort or by executive officers, is reenacted without any substantial change of verbage, it will continue to receive the same construction."

We think the foregoing rule has great significance in determining whether or not the action for exemplary damages survives. We make the foregoing statement due to the fact that since attorney's fees are recoverable in cases where exemplary damages may be recovered, that the Legislature had no intention of excluding the recovery of exemplary damages in the passing of Article 5525 aforesaid. See cases cited in Heaton v. Bristol, Tex.Civ.App., 317 S.W.2d 86, writ ref., writ of cert. denied by Supreme Court, 359 U.S. 230, 79 S.Ct. 802, 3 L.Ed.2d 765. Accordingly, points 1 and 2 are overruled.

Points 3, 4 and 5 are to the effect that the Court erred in failing to order remitti-tur of exemplary damages: (1) Because the damages are excessive as a matter of law; (2) No evidence to sustain the amount assessed by the jury, and (3) That the amount of the award is against the great weight and preponderance of the evidence.

A statement is necessary. On September 21, Millard C. Tate and his wife, Eleanor M. Tate, executed a note to the Houston-American Finance Corporation in the principal sum of $342.00. Testimony was tendered to the effect that included in this note were the following items: (1) Interest item $44.61 (usurious); another item of $6.00, filing and transfer fees 75¢, payment of premiums to the Houston-American Life Insurance Company $10.26, and another item for life, health and accident insurance $23.09, total deductions from loan $84.71, leaving the cash advanced and received $257.29. The Tates were required to execute the necessary papers relating to insurance, etc., in order to get the loan. The payments on the note were $19.00 per month, and it was the plan that under the terms of the insurance policy, the amount of the monthly payments on the note would be paid for total disability of more than six days duration. The Tates made the first six payments on the note, and after that Mr. Tate suffered a heart attack and was hospitalized on April 11, 1957. The due date of the next payment was April 21st. Collection contacts from the Finance Company commenced on April 22, 1957, at which time Mrs. Tate told the finance company that her husband had suffered a heart attack, and that he was in the Veterans' Hospital and was on the critical list. The finance company told her to make the payment and she did so on April 23, 1957; Tate was hospitalized until May 13, 1957, and was thereafter at home until July 19th, 1959, and during that period of time the Tates were unable to make payments on the note and Mrs. Tate received telephone calls, letters, one telegram and several special deliveries, and had one personal call; that the finance company called Mrs. Tate at all hours of

the day and even after 10:30 at night; that Tate was usually in the house when the calls were received, and Mrs. Tate told the finance company that since they had paid for an insurance policy in connection with the loan, she did not feel that they should have to make payments, but that the finance company told her she was going to make them; that they didn't know how but that "I had to make them;" that when the finance company called her on the telephone they used a "very rough" tone of voice, and "were very hateful" to her; that the calls caused her to be nervous, and have headaches, to lose her appetite and ability to sleep; that they caused her to be irritable and ill; that they caused Mr. Tate to be very upset; that he could not eat nor sleep, and that he suffered with headaches, loss of memory, and walked the floors at night. Mrs. Tate told them about her husband's condition; that in the telegram she received from defendant they advised her they were going to have to pick up the furniture; that it was "a very hateful telegram;" that after the special delivery letters she felt ill and very upset, irritable and nervous, and could not sleep; "that they tore her to pieces and nearly drove her crazy every time she received one;" that the special delivery letters caused her husband to be very upset; that he could not sleep, and would get up all hours and walk the floors and complain about his heart; that they also wrote the Tates letters and dun cards, all of which upset her and caused her to become very ill; that her husband returned to the hospital on July 19, 1957, and remained there until July 29, 1957, and during that time defendant contacted her by telephone many times. Sometimes they would call her as many as two calls in one day; that she told them her husband was in the hospital, and that he was not a well man and that she begged them to let them alone, but they said "we had to make the payments regardless of anything." The insurance company made one payment on the note to the finance company. After Mr.

Tate came home on July 29, 1957, they continued to receive contacts from the finance company until August 1958. Most of the calls were from Mr. Antes and Mr. Rumph, managers of the Houston-American Finance Corporation; that their voices were "very rough"; that they did not talk nice at all; that the calls tore her to pieces; that they called her a "deadbeat", and said she was just trying to "beat" her bills; that she was "lying"; that she had the money and should come down and pay them. On one occasion Mr. Rumph told her "he didn't give a damn" how she paid the bill; that he wanted her to pay it and "didn't give a damn how;" that she was upset for hours and hours after he used such language; that they made one personal visit to the Tate's home, and caused Mr. Tate to become so upset and nervous that he had to go to bed. In a letter dated February 19, 1958 to Mr. and Mrs. Tate, from Attorney, Henry Wise, formerly with the law firm of Iiron, Cain, Cocke and Magee, he notified the Tates that the law firm had been retained to collect $188.00, and that the loan was secured by "your household goods". The letter threatened foreclosure unless satisfactory arrangements were made within 10 days; that the letter made her ill and made her very upset; that she called Mr. Wise and told him about her husband's illness and that they were supposed to have an insurance policy to cover the payments on the note. Mr. Wise told her "I am not going to do anything to you. I didn't have the facts on this case. Furthermore, I don't care to represent them anyway." In a letter dated April 15, 1958, Mr. Tate wrote to the Insurance Commissioner, and sent a copy of the letter to the Houston-American Finance Corporation, and in this letter Mr. Tate told them about his heart attack on April 11, 1957, and of his going to the hospital on that date, and again on July 19, 1957, and that he was unable to do any work, but that the loan company continued to solicit the loan payments. In a letter postmarked April 23, 1957, to Mr. Tate, the

Finance Company advised him "Do not allow credit to become a String of Broken Promises like the string attached. Do not make it necessary for us to alert the credit bureaus of your present credit status. Do not make it necessary for us to send you our pamphlet 'How to prepare your furniture for repossession'". In a letter addressed to Mr. and Mrs. Tate received on July 2, 1958, the finance company advised them "Wrecking a bank building is pretty expensive, but the most important thing *you can wreck is your credit*. Our Records show that you failed to keep your promise. Telephone RI-1-4407, or come down in person at once to this office, make at least one full payment *now*." In August 1958, a card from the Finance Company was left at the Tate's house. It said: "Please phone and save me another trip." Mrs. Tate said that when the contacts were received from the finance company, "very often I would cry and I would get very nervous and upset when I think about it, even now." Mrs. Tate received surgery on October 29, 1957, and was in the hospital about ten days; that she was in extreme pain for about three weeks after getting out of the hospital; that during that time she continued to receive calls from the finance company. "Lots of time I was in bed and I had to get up and talk to them on the phone." That she told them about her condition and "begged them to let me alone and they just kept calling me." That she told them she was very, very ill. Mr. Rumph of the finance company told her "If you can't pay the bill and your husband is ill, and he can't work, and he can't pay it, why don't you get out and go to work?" That she told him she was unable to work, and he said: "Well, you will have to get a job. If you can't get one I will get one for you." This caused her to become frightened. He then said "If you don't get a job, I am going to bring a truck out and get your furniture." Rumph told her to go to the Texas Employment Commission and gave her the name of a man she should see; that be-

cause she was so frightened and ill, she went to the commission. She did not get a job there but did get one at Hartford Fire Ins. Company. After six weeks of work during which time she was getting more ill by the day, she had to stop work. With reference to the claims forms from the life insurance company, she testified that the finance company "wanted something different all the time; I would get what they wanted and they would call me and they would want something else, and I was chasing around for a long time trying to get everything they wanted, back and forth from the hospital." They were "generally obnoxious to me on the phone." In a deposition taken before Mr. Tate's death, he testified to the effect that the finance company began contacting him about a week after May 19, 1957, when the payment was due, and that in all he received between 50 to 75 calls from that company between that date and August 10, 1958; that the calls would be received from 9:00 A.M. until 10:30 at night, and on a few occasions they called twice in one day; that they averaged two or three calls per week. Tate further testified that sometimes they tried to coax a payment out of him, "and several times they threatened me over the phone, that they were coming out to take the furniture away from me; that they were going to turn me in to the Retail Credit Association"; that they used abusive language in that they accused him of lying, and they would get pretty nasty on the phone a few times; that he received numerous letters and occasionally a telegram; that he estimated he received 8 or 10 letters between the periods of hospitalization; that a representative from the finance company came out to see him between his first and second periods of hospitalization; that he spent about two and a half hours at his home one afternoon trying to persuade him to issue him a post-dated check for just one payment; that this visit caused him his "worst seizure;" that he told the representative that he was just out of the hospital and

was due to take his afternoon rest, but that he could not get the "scamp out of the house."

The jury, in its verdict, found that the finance company made unreasonable collection efforts against Mr. and Mrs. Tate, and further found in answer to Issues 19 and 26 that each of them suffered mental or emotional pain and physical illness and aggravation thereof after such unreasonable collection efforts, and further found that such unreasonable collection efforts were the proximate cause of the illness or aggravation thereof suffered by Mr. and Mrs. Tate, and further found that the unreasonable collection efforts against Mr. and Mrs. Tate were actuated by malice. As above stated, it found that Mr. and Mrs. Tate had suffered $100.00 each actual damages, and awarded the sum of $6300.00 as exemplary damages for the malicious collection efforts made against the Tates by the finance company.

We have read the statement of facts carefully, and have also made a careful examination of each of the exhibits tendered, and we are of the view that the evidence is ample to sustain the jury's findings to the effect that the collection efforts made by the defendant and its agents were unreasonable, and that in their efforts to make collection they pursued a course of constant harassment day and night, by telephone, telegraph, special delivery, by mail and by personal visitation, and at one time calling the Tates "dead beats", and also accused them of lying, and using other strong language as heretofore quoted, in ordering the Tates to do as they said, or have their credit ruined and furniture repossessed. The finance company's collection efforts would have been wrongful had the debt been a legitimate one. The jury found that of the $188.00 balance claimed to be due on the promissory note, the sum of $50.61 of this amount constituted usurious interest, and that the life insurance company owed Mr. Tate $196.93 for total disability benefits, which would have been sufficient to have discharged the note. As we understand appellant's position they do not contest the award of actual damages due Mr. and Mrs. Tate, but in their amended motion for new trial they say the judgment is incorrect: "Because the court failed to remit a portion of the exemplary damages assessed by the jury, as the jury awarded a ratio 31½ to 1, exemplary to actual damages; whereas, the evidence is insufficient to support a ratio of more than 2 to 1; and such verdict for a grossly greater ratio indicates passion and prejudice, and is, therefore, incorrect as a matter of law."

Much has been written by our appellate courts on the question relating to exemplary damages, but so far as we have been able to ascertain our Supreme Court has never fixed any exact ratio between actual and exemplary damages. Our appellate courts have held that where there is no actual damage, there can be no exemplary damages. So, our view is that there is no exact rule which can be laid down as to the ratio which should exist between actual and exemplary damages, and that the question of whether exemplary damages are excessive must be determined under the facts of each particular case in order to determine whether or not the award made evidences passion and prejudices. In Cotton v. Cooper, Tex.Com.App., opinion adopted by Supreme Court, 209 S.W. 135, we find this statement: "their proportion or ratio to the amount of actual damages recovered must depend upon the state of facts in any given case." In 17 Tex.Jur., 2d at page 256, Sec. 187, we find this statement of the rule: "The amount of exemplary damages should be reasonably proportioned to the actual damages sustained." The ratio in any particular case depends on the facts and necessarily much is left to the discretion of the jury. See Tynberg v. Cohen, 76 Tex. 409; 13 S.W. 315; Cotton v. Cooper, Tex.Com.App., 209 S.W. 135, supra, Flanary v. Wood, 32 Tex.Civ.App. 250, 73 S.W. 1072, writ ref.; See also 22 Tex.Law Rev. 235 and 117 A.L.R.2d 548. In Chemi-

cal Express v. Cole, Tex.Civ.App., 342 S. W.2d 773, n. r. e., we find this statement of the rule: "In determining whether a verdict is excessive the evidence must be viewed in a light most favorable to the award. * * * Courts are reluctant to disturb the findings of a jury on the grounds of excessiveness of the award if there is any evidence to sustain the award." As stated above, our Supreme Court has not fixed any exact ratio and in other jurisdictions we have found where the awards of exemplary damage have far exceeded, in some cases, the award in this case. For example in State Press Co. v. Willett, Sp.Ct. of Arkansas, in 219 Ark. 850, 245 S.W.2d 403, approved the sum of $1400.00 to $100.00. In Adams v. Cameron (1915) 27 Cal.App. 625, 150 P. 1005, and 151 P. 286, (Calif.) approved award $5000.00 to $300.00. In Cotton Lumber Co. v. La Crosse Lumber Co., 200 Mo.App. 7, 204 S.W. 957, n.w.h., approved a ratio 16 to 1. In Finney v. Lockhart, 35 Cal.2d 161, 217 P.2d 19, approved an award of $2000.00 to $1.00, and in Edwards v. Nulsen (Sp.Ct. Mo.) 347 Mo. 1077, 152 S.W.2d 28, approved an award of $25,-000.00 to $1.00. In Duty v. General Finance Company, 154 Tex. 16, 273 S.W.2d 64, our Supreme Court announced the rule that excessive harassment resulting in physical illness is a tort, and it has not seen fit to change or modify that rule. In this case we find the appellants endeavoring to enforce the collection of the balance on a usurious note for the total sum unpaid of $188.00, and of this amount $50.61 represented usurious interest, and in addition thereto, where the record is sufficient to support the fact that the plaintiff was entitled to have $196.33 in total disability benefit applied to the note. The record fails to show that defendant, at any time, was asking only for the difference between $188.00 and $50.61, but they were demanding the full $188.00 and threatening foreclosure of the mortgage unless such amount was paid. Defendants had a chattel mortgage on the furniture, they had an assignment of wages, they had an insurance pol-

icy that was taken out for their benefit; they had, without doubt, knowledge of the very serious illness of Mr. Tate and his wife, yet they continued a course of harassment after they had full knowledge of the illness of both Mr. and Mrs. Tate. The defendants had a note that was past due under its terms; it could have filed suit for its debt and for foreclosure of its chattel mortgage lien, but no doubt they had no desire to go to the court house to collect on a usurious contract, but rather chose the course of conduct of harassment, and in so doing, took extreme measures and went so far as to call the Tates "dead beats" and "liars". This court cannot approve such methods for the collection of debts or for the enforcement of contracts. It is true that our Supreme Court has not fixed any definite rule as to the ratio that should exist between actual and exemplary damages; however, our Supreme Court in Tynberg v. Cohen, 76 Tex. 409, 13 S.W. 315, supra, made this statement:

"when the actual damages recoverable were small, was a fact which ought to be looked to, to determine whether passion rather than reason dictated the verdict. Whenever this appears, or is rendered highly probable, by contrasting the actual injury with the extent of punishment awarded, looking to all the circumstances of aggravation * * *."

We are of the view that under all the circumstances and the record as a whole that the exemplary damage is excessive by the sum of $3000.00.

Point 8 is that: "The judgment is incorrect because there is no evidence to authorize the trial court to set aside the separate, valid and outstanding corporate identities of Houston-American Life Insurance Company, and Houston-American Life Underwriters so as to award plaintiff any monies for personal injuries, actual or exemplary damages, against said two corporations;" 9 is to the effect that the

judgment against the foregoing corporations is against the great weight and preponderance of the evidence; 10 is to the effect that the judgment is incorrect because plaintiff failed to request or obtain the submission of any issue whose answer would constitute legally sufficient facts authorizing a court to set aside the corporate identity of defendants, Houston-American Life Insurance Company and Houston-American Life Underwriters; 11 is to the effect that there is no evidence to show that defendants Houston-American Life Insurance Company and Houston-American Life Underwriters participated in any manner whatsoever in the collection contacts; 12 That the judgment is incorrect because a finding that Houston-American Life Ins. Company or Houston-American Life Underwriters participated in any manner whatsoever in the collection contacts is against the great weight and preponderance of the evidence; 13 The Judgment is incorrect because plaintiff failed to request or submit any issues inquiring in any regard as to Houston-American Life Ins. Company or Houston-American Life Underwriters' participation in any collection contacts.

A statement is necessary. In plaintiff's first amended petition she alleged that Life Underwriters owned 96% of the Class A. stock and 75% of the Class B. stock of the Finance Company and wholly owned or owned the controlling interest in the Life Insurance Company. She further alleged that M. V. Corey was president of the Life Underwriters and a director in the other two companies; that John Harris was president of the Finance Company and the Life Ins. Company, and that several of the directors held directorships in all three companies; that all three companies used the same address and the Finance Company and Life Insurance Company were operated as mere departments, adjuncts and instrumentalities of the Life Underwriters; and that the policies and direction of the subsidiaries were managed and controlled by the Life Underwriters

for the purpose of creating a monopoly in violation of Articles 7426 and 7429 V.T.C.S; that a condition for making the loan to plaintiff, as well as in all other loans made by the Finance Company during the period involved, said company required borrowers to purchase credit insurance on the commonly owned Life Insurance Company and gave borrowers no choice of insurance company or agent, in violation of Art. 3.53, Sec. 4 of the Ins. Code, V.A.T.S.; and that 50% to 70% of all insurance premiums for said insurance were refunded by the Life Ins Co., to the Finance Company; that in making the said coerced sales of insurance the Houston-American Finance Corporation conspired with Houston-American Life Ins. Company and Houston-American Life Underwriters, and the three defendants combined their capital skill and operations for each of the following purposes:

"(a) To create, tend to create, or carry out restrictions in trade or commerce and in free pursuit of borrowers of purchasing insurance;

"(b) To prevent or lessen competition in the business of selling and purchasing insurance;

"(c) To preclude free and unrestricted competition in the sale of business of insurance; and

"(d) To create a trust or monopoly in restraint of trade, in violation of Art. 7426 and Art. 7429 of the Revised Statutes of Texas."

Plaintiff further alleged that the word "defendant" as used in the pleading meant "each defendant, unless otherwise stated;" and alleged that the Finance Company made unreasonable collection contacts upon plaintiff, and that defendant ratified each of the acts alleged by various acts including accepting and restraining benefits of such acts after actual knowledge thereof, or after knowledge of facts sufficient to put defendant reasonably on notice of inquiry.

That the Life Insurance Company, by failing to make payments upon the timely claims for insurance benefits, and by failing to make payments upon said claim with the notice and knowledge that the Finance Company would proceed against plaintiff for the alleged balance due on the loan further collaborated and colluded in the harassment tactics used by the Finance Company in collecting on said loan. In a motion for severance filed July 16, 1959, by defendant Houston-American Life Insurance Company, they admitted that during the period of time in question Houston-American Finance Corporation was wholly-owned subsidiary of Houston-American Life Underwriters. They also admitted that Life Underwriters owned 116,672 shares out of 616,607 shares of stock in the Life Insurance Company.

In answers filed to plaintiff's requests for admissions, the defendants admitted that during a portion of the applicable period a majority of the stock of the Finance Company and Life Ins. Company was owned by the same stockholders, and also admitted that for a portion of the period Mark Enright owned stock in the Finance Company and the Life Insurance Company, and was President of those two companies, as well as Life Underwriters; that F. L. McNutt was Secretary of all three companies, and that M. V. Cory, Denton Kerr and Ben Ogletree were directors of all three companies, and all three companies operated from the same address, and the same inter-office correspondence form was used by all three companies. That on April 24, 1959, Life Underwriters and Finance Company merged, with the latter company being the surviving corporation and on May 6, 1959, the name of that corporation was changed to Standard General Company. The President of the new company, John Harris, had been the President of the Life Insurance Company and the Finance Company; that all pleadings on behalf of the three companies have been filed by Irion, Cain, Cocke and Magee. The finance company admitted that credit

insurance was issued in more than 95% of the loans made during the applicable period, and all credit insurance sold by the Finance Company was on Houston-American Life Ins. Company forms; that personnel in the Finance Company were qualified to issue policies of credit insurance for the insurance company; that the life insurance company refunded to the finance company 50% to 70% of all premiums on the said insurance sold by the finance company in connection with loans. Mr. and Mrs. Tate testified to the effect that they tried many many times to get the finance company to get behind their claims for insurance benefits under their policy with the life insurance company; that they even complained to the insurance commissioner, but they were successful in getting the insurance company to make only one payment of $20.00 on the note; that when she and her husband made the loan at the finance company they were given no choice as to the insurance company nor the insurance agent; that Mr. Antes, manager of the finance company, who closed the loan, did not even mention insurance to them until after they had signed all the papers; then he told them they were covered by insurance. Mr. Tate testified to the effect that he and his wife were in the finance company offices for only a few minutes when the loan was made. The man came out with the papers and said "sign them and we will give you a check"; that they were not given an option to purchase the insurance elsewhere; that Mr. Antes said, "We handle that through our own company." Tate further testified that they did not receive any insurance policy until two and one half months after he got out of the hospital; that he went by the finance company and obtained a copy when he did not get any results from sending in his doctor's reports; that Tate was asked if Rumph, subsequent manager of the finance company, ever indicated to him that he should be sending his claim forms direct to the Life Insurance Company. Mr. Tate's answer was:

"No, they told me to send them all in to their office, Houston-American."

The credit insurance policy issued to Mr. Tate disclosed that the printed form shows Houston-American Finance Company as first beneficiary. The jury, in its verdict, found that on or about September 21, 1956, the Houston-American Finance Corporation failed to give plaintiff the option to purchase the insurance involved herein from any insurer of his own choice. And further found that Houston-American Finance Corporation charged plaintiff for insurance involved herein with a purpose of obtaining additional compensation for the use of its money; and further found that Houston-American Finance Corporation charged plaintiff a service charge in excess of the reasonable value of special services afforded by Houston-American Finance Corporation to plaintiff. The jury further found that the Finance Corporation required plaintiff to take out an investment certificate as a condition precedent to making plaintiff the loan in question; that defendant was not operating a genuine investment business, and that the investment certificate plan was utilized with a purpose of increasing to a sum in excess of 10% per annum the compensation charged for the use, detention or forbearance of money. The jury further found that the Finance Company and Life Ins. Company were operated as a mere department, adjunct or instrumentality of Houston-American Life Underwriters, and further found that the Finance Company and Life Insurance Company were commonly controlled by Life Underwriters.

■■■ Points of error beginning with 8 through 13 complain of the judgment having been rendered against Life Underwriters and the Life Insurance Company upon the ground that there is no evidence or insufficient evidence to justify judgment being rendered against these defendants jointly with the Finance Company. Stated a little differently, that the evidence does not justify the Court's action in piercing the corporate veils of such companies. We

think the foregoing factual situation is controlled by the rule announced in Pacific American Gasoline Company of Texas v. Miller, Tex.Civ.App., 76 S.W.2d 833, w. ref. The rule being stated on page 851:

"The legal fiction of the separate entities of two corporations, the stock of which is owned by the same parties, should be disregarded when necessary for the prevention of fraud or to protect the legal rights of third parties. Upon ascertainment of all the facts, it is the prerogative of the court and not the jury to look through the forms to the substance of the relations existing between the corporations." (citing a long list of cases). "Upon ascertainment of the facts, the courts will disregard the fiction of corporate entity where the fiction (1) is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong."

It is our view that the evidence of record clearly shows that the court's action in rendering judgment against the life insurance company, and life underwriters, was justified under the foregoing rule. At all events, it was a question of fact for the jury and there was sufficient probative evidence to support its findings that the subsidiaries were mere departments, adjuncts, etc., and commonly controlled by Life Underwriters. See also State v. Lone Star Gas Company, Tex.Civ.App., 86 S.W.2d 484, w. ref., by Supreme Court, but reversed on other grounds by the Supreme Court of the U. S. in 304 U.S. 224, 551, 58 S.Ct. 883, 82 L.Ed. 1304. See also First National Bank in Canyon v. Gamble, 134

Tex. 112, 132 S.W.2d 100, 125 A.L.R. 265, opinion adopted. In that case the Supreme Court said: "It is the rule that the legal fiction of corporate entity may be disregarded where the fiction is used as a means of perpetrating fraud or is relied upon to justify wrong." Our view of this record is that the evidence tendered is to the effect that the corporations are not separate entities in fact, but only by legal fiction, and the peculiar facts are such that adherence to the fiction would promote injustice and lead to a most inequitable result. It is our view that corporate fiction was used by Underwriters to perpetrate a fraud; that the finance company induced the borrowers to pay extra for credit insurance without advising them that the finance company would place the insurance with a commonly owned insurance company; that the defendant insurance company collaborated by furnishing the insurance without advising plaintiff of the common ownership that the parent corporation set up the companies for such purpose and reaped the ultimate benefits; that the Finance Company and the Life Insurance Company were mere tools of Life Underwriters, and that the jury had a right to infer that the life insurance company was established to issue insurance on loans financed by the finance company, with a purpose of enabling Life Underwriters to make more money than if the borrower were to place his insurance with an independent agent and company. In the case at bar the Life Insurance Company refused to pay plaintiff's claim and thereby avoided the taking of the money out of the insurance company and put it in the finance company. Fortunately our laws of entity protect against a finance organization funneling its profits through an insurance company and thereby evading financial responsibility to the victims who are the source of such profits. We think the corporate fiction was employed by the defendants to achieve or perpetrate monopoly in violation of Art. 7426 and 7429, V.T.C.S. We think the record contains facts to the effect that the

three companies were under common management and control, and the jury so found, so as to tend to prevent sale of insurance to Tate and other borrowers, and for this reason they constituted a monopoly. Moreover, the corporate fiction was used to circumvent the insurance code and the usury statutes. Sec. 5, of Art. 21.14 of the Insurance Code of Texas provides that the agent for the sale of insurance shall be a Texas citizen of good character actively engaged in good faith in the business of insurance. The purpose of this statute was to afford to the citizens of Texas, including the Tates, the protection which comes from having independent agents counsel and help them in their insurance affairs. One of the evils from which citizens are thus protected in coercion of insurance, including the precise type of coercion practiced against the Tates by defendants through the transaction set up by them in this record. Article 3.53, Sec. 4, of the Insurance Code provides that "no lender or lender agent shall hereafter require as a condition for the making of a loan that the borrower purchase either credit life or credit health and accident insurance from such lender, lender agent or any insurer represented by them." The law provides that insurance may be required of the borrower but "if, and only if, the borrower is given the option to purchase such insurance from any insurer or insurance agent of his own choice." The statute concludes with the following language: "It is the intent of this section to prohibit coercion of insurance and to preserve to each citizen the right to choose his own insurer and insurance agent." The corporate fiction in this case was used in violation of those provisions as shown by jury findings of failure to give an option.

■ Another Section of the Insurance Code was violated. Art. 21.02 prohibits anyone from taking or placing insurance other than a licensed agent. In the case at bar the Finance Company actually took and placed insurance. The finance company

was not a licensed agent. As a corporation, it was prohibited by Art. 21.14 from being a licensed agent, so it violated Art. 21.02 by placing the insurance. Article 21.11 prohibits a non-resident or an unlicensed person from receiving any commission or other consideration from a policy. Here the commission payment was by-passed by using a corporate employee as purported agent, but the finance company, an unlicensed fictional entity, got the benefits of plaintiff's policy through the 50% to 70% commission and the holding company got the benefit of the balance of the premiums through its ownership of the insurance company.

Points 8 through 13 inclusive are each overruled. We have carefully considered each of the other points raised by appellants, and each is overruled.

 Since we have previously stated that the award of exemplary damages in the amount of $6300.00 is excessive by the sum of $3000.00, and that said cause should be reversed for that reason only, it is our duty under Rule 440 Texas Rules of Civil Procedure, to call the matter to the attention of the attorneys for appellees and specify within what time they may file remittitur of such excess. Accordingly, appellees are given ten (10) days from this date in which to file remittitur of $3,000.00 of the exemplary damages awarded for malicious prosecution. If they shall do so within said period of time the judgment will be affirmed, and the costs of this appeal to the filing date of the remittitur shall be taxed against appellees; otherwise, the judgment will be reversed and the cause remanded.

## OPINION AFTER ENTRY OF REMITTITUR

Appellee, Eleanor M. Tate, has filed and entered the remittitur of $3,000.00 as exemplary damages, as required by a former order of this court. The judgment of the trial court is reformed in conformity with said remittitur, and as reformed, is affirmed.

All costs of appeal to the date of the remittitur will be assessed against appellee. All the costs in the trial court are assessed against appellants.